S05A1060. REDWINE v. THE STATE.
(623 SE2d 485)

HINES, Justice.

Christopher Michael Redwine appeals his convictions for malice murder, armed robbery, and burglary, all in connection with the death of Tiffani Miller. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Redwine knew that Miller kept a lock-box in her residence. Miller and her fiancé, Thomas Vowell, kept their infant's Social Security card and some medical records in the lock-box. On April 17, 2000, Redwine and Randy Smallwood had been snorting cocaine; Redwine had also been drinking alcohol and taking the drug ecstasy. The two men determined to commit a robbery and went to the home of a friend, Clark, and asked to borrow gloves, but he did not give them any. Redwine took a vehicle belonging to his friend, Coroi, without her permission. He and Smallwood purchased gloves and duct tape and went to the residence of someone they intended to rob, but he was not present. They then resolved to rob Miller of her lock-box and went to her apartment, entering sometime before 7:00 a.m.

---

[1] Miller was killed on April 17, 2000. On October 10, 2000, a Muscogee County grand jury indicted both Redwine and Randy Gene Smallwood, Jr. for malice murder, felony murder while in the commission of armed robbery, armed robbery, and burglary. Redwine was tried alone before a jury on January 14-15, 2002, and found guilty of all charges. On January 15, 2002, Redwine was sentenced to life in prison for the malice murder, a consecutive term of life in prison for the armed robbery, and a term of 20 years in prison for the burglary, to be served consecutively to the term for armed robbery; the court entered an order of nolle prosequi on the felony murder charge. Redwine moved for a new trial on February 5, 2002, amended his motion on June 2, 2004, and amended it again on June 14, 2004. On December 8, 2004, the trial court entered an order denying the motion for new trial, and on December 15, 2004, entered an amended order, also denying the motion. Redwine filed his notice of appeal on January 7, 2005, the appeal was docketed in this Court on March 18, 2005, and submitted for decision on May 9, 2005.

Redwine held Miller down while binding her with duct tape. Smallwood stabbed Miller several times with a pair of scissors, and with a steak knife, cut her throat, and kicked and bludgeoned her. Each man got a considerable amount of blood on his person; Redwine went into the bathroom to wash. The men left, taking the lock-box. They returned to Clark's home with blood on their clothes, asked for clothes to change into, and put their bloody clothes in an empty dog food bag. Clark and another friend, Cromey, saw the open lock-box containing a Social Security card, birth certificate, receipts, and a paper with Miller's name on it. Redwine pulled Clark aside and told him that Smallwood was crazy and had killed a girl. Smallwood told Clark that the act sexually aroused him and said he might become a "mercenary for hire." Redwine and Smallwood left with Cromey, saying that they were going to meet Norman Roman.

Roman, who died prior to trial, told police that Redwine called and asked for a ride; when Roman asked if he would be in any danger, Redwine hesitated and said "not really." Roman drove to meet Redwine, Smallwood, and Cromey. The men put a large dog food bag in Roman's vehicle. Cromey departed and returned Coroi's vehicle to her. Roman drove Redwine and Smallwood to a rural location, where Redwine and Smallwood burned the bag. During the drive, Redwine said "Oh, God . . . I've done it," and seemed remorseful.[2] Roman took Smallwood and Redwine to different locations. When Redwine exited Roman's vehicle, he took with him a revolver that Smallwood and Redwine had brought with them.

Later that day, Smallwood went to the hospital and after leaving it, told a friend, Pryor, that he had broken his toe by kicking a female "snitch" in the head. Smallwood also said that he and Redwine had killed someone, it "got out of control" and "crazy," and implied that Redwine had gotten out of control as well. Redwine returned to Coroi's home where he took a bath. He later got Coroi's agreement to serve as his "alibi."

1. The evidence was sufficient to enable a rational trier of fact to find Redwine guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Redwine particularly asserts that the evidence was insufficient to establish the crime of burglary, as he was acquainted with Miller and there were no signs that he forced entry into her dwelling. But forced entry is not an element of burglary. See OCGA § 16-7-1 (a). Redwine was charged with unlawfully entering Miller's apartment with the intent to commit a theft. Although he stated to

---

[2] In a statement to police, Redwine said that the bag included the lock-box taken from Miller's apartment.

police that he and Smallwood were admitted into the apartment through the front door by Miller, there was evidence that the side sliding glass door to the dwelling had been left unlocked, and that the front door was locked with a dead bolt and chain when police arrived. Redwine's own statements to police were that he and Smallwood went to Miller's home to rob her. Vowell, who resided in Miller's home, testified that Redwine and Smallwood did not have permission to be in the apartment the day of the murder. The evidence authorized the jury to find him guilty of burglary. *Jackson*, supra.

2. Redwine gave three statements to the police; the second and third admitted culpability in Miller's murder. Redwine asserts that these latter two statements were not admissible because each was induced by the hope of receiving benefits. See OCGA § 24-3-50. He contends that he made the second statement because he was promised that he would not be charged with murder if he did so. Although he testified to this effect at the hearing on the motion for new trial, during the *Jackson-Denno*[3] hearing he testified that he gave the statement freely. Additionally, the detective allegedly involved with the giving of this statement specifically denied any such promise. Redwine further asserts that he was promised the benefits of being allowed to see his wife and child, and that he would be given special food if he made this statement. As support for this assertion, he relies upon his wife's inference that such promises had been made, but she testified that she did not hear any such promises, and Redwine did not testify to any such promises.

The third statement was made with Redwine's lead counsel present. Redwine contends that there was an agreement in place that provided the State would not seek the death penalty against him[4] in exchange for his pleading guilty and testifying against Smallwood, and that the third statement was "part and parcel" of this agreement.[5] However, at the hearing on the motion for new trial, Redwine testified that the State did not offer him a lighter sentence in exchange for his willingness to testify truthfully against Smallwood, and that, in fact, "[t]hey never offered me anything." Further, lead defense counsel testified that the plea agreement was in exchange for Redwine's truthful testimony at trial, and was fully in place before this statement was made, and that while the State wished a third statement to be made, the plea agreement would not have been rescinded if Redwine had refused to make the statement. Lead

---

[3] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[4] The State had served notice of its intent to seek the death penalty. Unified Appeal Rule II (C) (1).

[5] Smallwood later pled guilty in connection with Miller's death.

counsel also testified that he wished Redwine to make this third statement because he viewed it as protection if, after Smallwood's trial, the State attempted to renege on the agreement and claim that Redwine's testimony was not truthful, the full, recorded, third statement would rebut that claim. Such tactical decisions do not render a resulting statement inadmissible under OCGA § 24-3-50. See *Williams v. State*, 250 Ga. 553, 558-560 (1) (300 SE2d 301) (1983). Compare *Corthran v. State*, 268 Ga. 443 (491 SE2d 66) (1997).

The trial court told the jury that the second and third statements were freely and voluntarily entered; Redwine contends this was error. But the court's instruction to the jury was pursuant to a stipulation between the State and Redwine. Thus, not only did Redwine fail to object to the court's action, see *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999), but he induced the very action he contends to be error, and cannot now be heard to complain. *Scott v. State*, 274 Ga. 476, 479 (5) (554 SE2d 488) (2001).

3. Redwine contends that he did not receive effective representation of trial counsel in several respects. In order to prevail on a claim of ineffective assistance of counsel, Redwine must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of this test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong, Redwine must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

(a) Redwine contends that counsel should have pursued a request for a psychological examination, should have pursued an insanity defense under OCGA § 16-3-2, and should have asserted that Redwine was not competent to stand trial under OCGA § 17-7-130. Redwine was represented at trial by two attorneys. They testified that they obtained information about his psychological history in anticipation of a mitigation defense in a death penalty trial, but that nothing in this information, or in their interactions with Redwine, suggested that a psychological examination would have raised the

defense that he could not distinguish between right and wrong, see OCGA § 16-3-2, or that he was not competent to stand trial. And Redwine has not presented any evidence that he was so impaired. In fact, the psychological evidence that was presented showed that Redwine's apparent remorse indicated that he knew right from wrong, and that he is not mentally retarded. Accordingly, as there is nothing of record to indicate that counsel should have pursued the acquisition of further psychological evidence, or raised issues of insanity or incompetency, or that doing so would have assisted Redwine's defense, the trial court did not err in denying the motion for new trial on this asserted ground of ineffective assistance of counsel.

(b) Redwine contends that counsel should have objected to the admission of his second and third statements to police, as having been made in the hope of receiving benefits in violation of OCGA § 24-3-50. As to the second statement, even if counsel had objected, Redwine cannot show prejudice. As discussed in Division 2, supra, his own testimony at the *Jackson-Denno* hearing was that the statement was freely made, and there is no reasonable probability that an objection would have kept the statement from being admitted.

Nor is either deficient performance or prejudice shown in regard to the admission of the third statement. Lead counsel's testimony was that the statement was not part of a plea agreement. Allowing the statement to be made was a reasonable strategic decision. See Division 2, supra. And at trial, counsel also saw benefit in its admission as it put before the jury several self-serving statements of Redwine's without placing Redwine on the stand and subjecting him to cross-examination.

(c) Roman Norman was deceased at the time of trial. His statement to police was admitted into evidence under the necessity exception to the hearsay rule. See OCGA § 24-3-1 (b). Redwine argues that an objection should have been lodged under the Confrontation Clause of the Constitution of the United States, citing *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), for the proposition that the statement to the police was testimonial, and Redwine had no opportunity to cross-examine Roman, and therefore it was inadmissible. However, Redwine's trial was conducted in 2002, before the 2004 decision in *Crawford*, supra. "[I]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law." (Citation and punctuation omitted.) *Rickman v. State*, 277 Ga. 277, 280 (2) (587 SE2d 596) (2003). Although this Court has held that *Crawford* applies to the admission of evidence in cases pending on direct review at the time that opinion was issued, see *Gay v. State*, 279 Ga. 180, 182, n. 2 (611 SE2d 31) (2005), that does not alter the long-standing precedent that, when

addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. *Smith*, supra at 784. Thus, *Crawford* does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued. Accord *Iowa v. Williams*, 695 NW2d 23, 29-30 (Iowa 2005) (holding that while *Crawford* applies retroactively to the admission of evidence, it does not apply retroactively for evaluating claims of ineffective assistance of counsel).

At the time of trial, it was clear that a challenge under the Confrontation Clause, in circumstances such as these, was analyzed similarly to the admission of hearsay under the necessity exception. *Yancey v. State*, 275 Ga. 550, 553 (2) (b) (570 SE2d 269) (2002). Accordingly, Roman's statement, to be properly admissible, must have been accompanied by indicia of reliability. Although Redwine asserts that the circumstances surrounding the statement rendered it inherently unreliable, he does not articulate those circumstances in his brief. In any event, even if error, the admission of the testimony about Roman's statement was harmless; it was cumulative of evidence that was placed before the jury in Redwine's third statement to police. See *Gibson v. State*, 277 Ga. 486 (2) (591 SE2d 800) (2004).

(d) Pryor testified that Smallwood told him some things about the murder, including that he had broken his foot kicking a "snitch" in the head, and that Smallwood implied that Redwine had been out of control during the incident. Redwine contends that counsel should have objected to this testimony. When questioned during the hearing on the motion for new trial, lead counsel testified that he did not object on either hearsay or Confrontation Clause grounds because he did not believe that such an objection would be sustained.

"Statements made by a co-conspirator during the pendency of the criminal project, including the concealment phase, are admissible against all other co-conspirators. OCGA § 24-3-5; [cit.]" *Neason v. State*, 277 Ga. 789, 791 (2) (596 SE2d 120) (2004). Although Redwine urges that the concealment phase of the conspiracy had ceased with the destruction of the physical evidence, the concealment phase of the conspiracy was, in fact, continuing at the time Smallwood made his statements to Pryor; the statements were made the same day as the murder, and neither Redwine nor Smallwood had identified the other to the police as a perpetrator at this time. See *Crowder v. State*, 237 Ga. 141, 152 (227 SE2d 230) (1976). And two days after the murder, Redwine told the police that he had last seen Miller four days before her murder, making no mention of Smallwood or their crimes, indicating his intention to continue the concealment phase.

> The admission of a co-conspirator's statement does not violate the Confrontation Clause as long as there are "sufficient 'indicia of reliability.'" [Cit.] Factors indicating reliability include (1) the absence of an express assertion of past facts, (2) the co-conspirator had personal knowledge of the facts he was stating, (3) the possibility that the co-conspirator's recollection was faulty was remote, and (4) the co-conspirator had no reason to lie about the defendant's involvement in the crime. [Cits.]

*Neason*, supra. Applying these factors would not lead to a ruling that Smallwood's statements to Pryor lacked sufficient indicia of reliability. To the contrary, the statements bore indicia of reliability. They contained no express statement of past facts; in fact, Pryor testified that Smallwood spoke in general terms and only implied that Redwine "got out of control," and the jury could therefore draw its own conclusion concerning the weight to be accorded the testimony. See *Dutton v. Evans*, 400 U. S. 74, 88-89 (91 SC 210, 27 LE2d 213) (1970); *Fetty v. State*, 268 Ga. 365, 372 (7) (489 SE2d 813) (1997). And Smallwood was speaking about matters he knew of firsthand, on the same day that they occurred. See *Neason*, supra. Contrary to Redwine's contention that the statements were unreliable because Smallwood was attempting to shift blame from himself to Redwine, the statements to Pryor did not assert that Redwine was "more guilty" than Smallwood; Smallwood implicated himself as at least an equal of Redwine. See *Fetty*, supra.

Counsel was not ineffective for determining that a hearsay or Confrontation Clause objection to Pryor's testimony would have been fruitless.

(e) Finally, Redwine contends that counsel was generally unprepared for trial, without a competent theory of defense, presented no evidence, and missed numerous opportunities to cross-examine witnesses. Counsel testified that the theory of the defense was to paint Smallwood as the primary actor and that Redwine was essentially in shock at Smallwood's actions. Redwine does not show any prejudice arising from this defense; the only alternative he suggests is to raise insanity or incompetence, but he presents no evidence suggesting that such strategies might have been productive. See Division 3 (a), supra. Nor does he state what evidence should have been introduced, or demonstrate what information cross-examination might have yielded. His only specific complaint is that counsel asked a witness about bags of white powder which were visible in photographs of Miller's home, implying that the bags contained drugs, but without

any evidence that they did. But he does not demonstrate that the result of the trial would have been different if counsel had not pursued this course.

*Judgments affirmed. All the Justices concur.*

DECIDED DECEMBER 1, 2005.

*Berry, Shelnutt, Day & Hoffman, John M. Shelnutt, David B. Ross*, for appellant.

*J. Gray Conger, District Attorney, David R. Helmick, Assistant District Attorney, Thurbert E. Baker, Attorney General, Vonnetta L. Benjamin, Assistant Attorney General*, for appellee.