## A10A0953. CHATMAN v. THE STATE.
### (702 SE2d 51)

MIKELL, Judge.

In a bifurcated trial, a Chatham County jury convicted Kenneth Ray Chatman, Jr., of armed robbery, aggravated assault, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. Chatman was sentenced to life on the armed robbery, twenty years to run concurrent on the aggravated assault, fifteen years to serve consecutive to the armed robbery on the possession of a firearm during the commission of a felony, and five years to serve concurrent with Count 1 on the remaining conviction.[1] On appeal, Chatman raises the single enumeration of error that his trial counsel was ineffective. Finding no error, we affirm Chatman's convictions.

The evidence adduced at trial showed the following. Deandra Reedy and Shaunte Mitchell, and Mitchell's son, Shadray Mitchell, and her sister, Chaquita Jones, lived in an apartment in Chatham County. Reedy testified that during the early morning hours on March 16, 2007, she was awakened by the sound of a window breaking in her room; that a man held a gun through the window and told her to give him money or he would shoot her; that Mitchell[2] and Jones came into the room and the perpetrator continued to demand money; and that Mitchell left the room and came back with money that she gave to Reedy to give to the man. Mitchell called the police.

---

[1] Chatman received this sentence in an amended order of the trial court after the state filed a petition to correct void sentence and to resentence Chatman to life in prison on the armed robbery conviction under OCGA § 17-10-7 (a). The original sentence imposed was twenty years to serve for armed robbery, twenty years to serve concurrent for aggravated assault, five years to serve concurrent for possession of a firearm during the commission of a crime, and five years to serve consecutive on the possession of a firearm charge.

[2] "Mitchell" refers to Shaunte Mitchell, not Shadray Mitchell.

Reedy recalled that she told the police that the perpetrator was a tall black man, whom she had seen around her neighborhood, but she maintained that she did not know him. Reedy testified that the man wore a hat, but she could not recall if he had on a jacket. Reedy later identified Chatman as the perpetrator at the police station.

Mitchell testified that on the evening in question, she worked as a dancer from 9:00 p.m. to 4:00 a.m. When she arrived home, she noticed that a white four-door car with blue stripes was circling her block and that the car was being driven by a female, who was accompanied by a male passenger. Mitchell testified that she thought the car belonged to a female named T. J. Mitchell further testified that she entered her home and went to her room, which she shared with Reedy, and saw a man bust the window in the room and point a gun at Reedy; that the man told Reedy to tell Mitchell to give him all of her money; and that she complied with his request then called the police. Mitchell recalled that the money she gave the man was money she earned as tips so it was in small denominations, specifically several one dollar bills and a few twenty dollar bills. Mitchell recalled that the man had on a white hat and a grey jacket. Mitchell also testified that Reedy told her that she knew the perpetrator, whom she called "Kenny Blue." Mitchell's sister, Jones, who was 12 years old when the incident occurred, also testified that after the incident, Reedy said "that's that boy Kenny Blue."

The 911 operator testified that the call on the armed robbery came in at 4:30 a.m. Officer Santana Willis of the Savannah Chatham Metropolitan Police Department responded to the scene. He testified that Mitchell was nervous and scared, told him that they had just been robbed, and described the suspect as a black male and the weapon used as a black handgun. Mitchell told Willis about the vehicle that had been circling her residence and that she saw the perpetrator run to the same type of vehicle.

Officer Mark Smith also responded to the 911 call. While en route to the scene, which was less than a half of a mile away from his location, he saw a car that met the description of the suspect's car. Officer Ralph DiFiore, traveling in a separate vehicle, also testified that he saw the car at issue, which was occupied by a female driver and a male passenger wearing a white baseball cap. Both Smith and DiFiore followed the car, which accelerated once the officers activated their lights. The vehicle hit a parked car, and both occupants jumped out. The female driver ran toward Smith, shouting that there was a gun in the car. Smith handcuffed her and placed her in his patrol car. Meanwhile, Chatman ran, but DiFiore was able to apprehend and restrain him. After handcuffing Chatman, DiFiore went to the car where he saw a black, semi-automatic handgun

sitting in the console and a bunch of cash on the ground next to the passenger side of the car.

Detective Yujean Foster responded to the scene where the suspects had been apprehended and saw Mitchell in Willis's vehicle. Detective Foster testified that he planned to conduct a show-up identification at the scene, but Mitchell told him that she already had identified the suspects. According to Detective Foster, Mitchell also told him that the suspects' vehicle was the same one that had been circling her residence before the robbery. Detective Foster asked Mitchell to contact Reedy and have her come to the police headquarters to be interviewed.

At the police station, Detective Foster interviewed Mitchell, who gave him the denominations of the money that had been stolen from her; and he also interviewed Reedy when she arrived. Detective Foster testified that Reedy gave him a detailed description of what happened and told him that she knew the suspect. A recording of both interviews was played for the jury but was not transcribed in the record.

Detective Foster recalled that after the interviews, he conducted a show-up with Reedy, who identified Chatman as "Blue" and said that he robbed her. Additionally, Detective Foster testified that the money found near the vehicle on the ground and in a purse near the vehicle was in small denominations. Detective Foster also recalled that Chatman wore a jacket on the evening in question but admitted that no jacket was listed on the inventory list compiled when Chatman was processed.

On appeal, Chatman argues that his trial counsel was ineffective, and we find no error.

> In order to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[3] [Chatman] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance.[4]

However, "[i]n ruling on an ineffectiveness claim, this Court need not analyze the deficient performance prong if the Court determines the prejudice prong has not been satisfied."[5]

---

[3] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984),

[4] (Citation and punctuation omitted.) *Reid v. State*, 286 Ga. 484, 485-486 (3) (690 SE2d 177) (2010).

[5] (Citation and punctuation omitted.) *Killings v. State*, 296 Ga. App. 869, 873 (3) (676 SE2d 31) (2009).

(a) Chatman asserts that trial counsel was ineffective because she did not adequately explain to him the possibility that he faced a mandatory life sentence if the state introduced three prior convictions under OCGA § 17-10-7 (c), or a sentence of life under OCGA § 17-10-7 (a), where he would not be eligible for parole until he served 30 years, and that consequently, he could not make a knowing and intelligent decision as to the state's plea offer. Our Supreme Court has ruled that the failure to inform a defendant that he would be ineligible for parole if sentenced as a recidivist does not amount to ineffective assistance of counsel.[6] "[I]neligibility for parole does not lengthen a sentence but is merely a legislatively imposed collateral effect on a sentence, and there is no requirement that a defendant be informed of such a collateral consequence."[7] Additionally, in the context of guilty pleas, "the proper question at the prejudice step is whether [Chatman] demonstrated that, but for counsel's deficient performance, there is a reasonable probability that he would have accepted the State's plea offer."[8]

> [Our Supreme Court] held in *Lloyd v. State*[9] that in order to find prejudice in this type of situation, there must be some indication that the defendant was amenable to the offer made by the state. [The Court] rejected bright-line rules adopted by some courts for determining prejudice under similar circumstances, such as presuming the defendant would have accepted any plea offer more favorable than the eventual outcome of the trial, or requiring a defendant to show that he or she evinced an interest in pleading guilty prior to the verdict. Instead, we said that we prefer to examine the facts of each case and grant relief where there is at least an inference from the evidence that the defendant would have accepted the offer as made or something similar and noted in passing that such an inference could be drawn even where the evidence is disputed or unclear on this question.[10]

In the instant case, trial counsel testified that she discussed the plea

---

[6] *Gary v. State*, 244 Ga. App. 577, 578 (536 SE2d 220) (2000), citing *Williams v. Duffy*, 270 Ga. 580, 582 (1) (513 SE2d 212) (1999).

[7] (Footnote omitted.) *Gary*, supra.

[8] (Footnote omitted.) *Cleveland v. State*, 285 Ga. 142, 145 (674 SE2d 289) (2009).

[9] 258 Ga. 645 (373 SE2d 1) (1988).

[10] (Punctuation, footnotes and emphasis omitted.) *Cleveland*, supra at 145-146. Accord *Muff v. State*, 210 Ga. App. 309, 311 (2) (436 SE2d 47) (1993) (case remanded for evidentiary hearing to determine whether it could be inferred that defendant would have accepted the state's offer or something similar).

offer with Chatman, told him that he was facing a possible life sentence or life without parole, and tried to explain the recidivist statute to Chatman, but Chatman did not want to talk about it. Trial counsel further testified that when she attempted to discuss the details of the plea, Chatman repeatedly said that it was not good enough and that she needed to do better. Additionally, when she tried to discuss the ramifications of rejecting the plea, Chatman would become angry, yell at her, maintain his innocence, and insist that they discuss the evidence instead. At the hearing on the motion for new trial, Chatman testified that he would have accepted the plea offer had he known that he would have to serve 30 years before he could be considered for parole, but he also testified on cross-examination that he was innocent and was not interested in a plea offer.[11]

Credibility determinations are exclusively within the province of the factfinder,[12] and the trial court's factual findings and credibility determinations will be accepted unless clearly erroneous.[13] It is clear from the trial court's ruling that it "did not find [Chatman's] after-the-fact, self-serving assertion credible."[14] We find no error in the trial court's decision to reject Chatman's version of the facts and credit instead the testimony of his counsel.[15] Accordingly, we conclude that Chatman has not carried his burden of proving that there was a reasonable probability that, but for his trial counsel's deficient performance, he would have accepted the state's plea offer.

(b) In four assertions of error, Chatman argues that trial counsel had no theory of defense, which caused the trial court to comment that it did not understand the theory of defense, and impeded trial counsel's ability to make effective opening and closing arguments and to defend the case. Trial counsel testified that the defense theory was misidentification; that she did not discuss the theory during the opening statement because she wanted to develop it during cross-examination of the state's witnesses; and that she made a strong closing argument about the state's theory of identity.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-

---

[11] The record also shows that Chatman rejected the plea offer of 20 years to serve 14 on the armed robbery charge and stated that he understood the consequences and ramifications of the sentence that could be imposed in light of his criminal history.

[12] See *McDaniel v. State*, 279 Ga. 801, 802 (2) (a) (621 SE2d 424) (2005) (trial counsel authorized to believe counsel's testimony over the defendant's).

[13] *Stinson v. State*, 286 Ga. 499, 500-501 (2) (689 SE2d 323) (2010).

[14] (Footnote omitted.) *Cleveland*, supra at 147.

[15] See id.

guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.[16]

To the extent that Chatman is arguing that the only viable alternative was to forego trial and accept the plea, we defer to the discussion above. However, if Chatman is asserting that a better defense theory exists, he has made no argument as to what that theory should have been or as to what evidence should have been introduced to support that defense. Therefore, again, Chatman has not established prejudice, i.e., that there was a reasonable probability that the result of the trial would have been different if counsel had pursued a different defense.[17]

(c) Chatman asserts that trial counsel was ineffective because she failed to mention Crissy Foster ("Crissy"), the person who was arrested with Chatman and had robbery proceeds in her purse. Additionally, Chatman asserts as error trial counsel's failure to object to hearsay testimony that Crissy yelled that there was a gun in the car when she and Chatman were apprehended.

Trial counsel testified that for strategic reasons there was no need to mention Crissy's name[18] and that the hearsay testimony about Crissy's statement was admissible as part of the res gestae. Trial counsel filed a motion to exclude Crissy's statement, to which the state agreed, but she did not object to the hearsay testimony. Pretermitting whether the statement was admissible as part of the res gestae, however, we find that Chatman has not established

---

[16] (Punctuation omitted.) *Johnson v. State*, 286 Ga. 787, 790-791 (2) (692 SE2d 575) (2010), citing *Strickland*, supra at 689.

[17] See *Redwine v. State*, 280 Ga. 58, 64-65 (3) (e) (623 SE2d 485) (2005).

[18] Trial counsel also testified that she was concerned that facts about Crissy's circumstances would be admitted that would not benefit her client. Specifically, Crissy had been threatened and her house had been burned down.

prejudice, because there was direct evidence from DiFiore that a gun was found in the car.[19] Additionally, Chatman has not shown how he was prejudiced by trial counsel's failure to discuss Crissy where there was direct evidence from the victims that Chatman was the perpetrator, not Crissy, and that Chatman used a gun to commit the armed robbery. Thus, these asserted errors do not amount to ineffective assistance of counsel.

(d) Chatman mentions trial counsel's handling of Reedy's testimony in several of the grounds asserted as the basis for a finding of ineffectiveness. Chatman asserts that trial counsel should have subpoenaed Reedy to impeach her with her prior inconsistent statement. The pertinent facts pertaining to Reedy's testimony follow.

The videotaped interview of Reedy conducted by Detective Foster was played for the jury, in which she identifies Chatman as the perpetrator. Trial counsel indicated that she planned to call Reedy as a witness and to introduce the tape of Reedy's conversation with Chatman's former lawyer, William Dowell, in which she told him that she did not want to have the wrong person arrested and that several people had told her that Chatman was not the perpetrator; however, trial counsel was unable to introduce the recording as a prior inconsistent statement because Reedy was not present to authenticate the tape. The court gave trial counsel time to locate Reedy to no avail, then it resumed the trial, at which point the defense rested without offering any evidence. Trial counsel testified at the hearing on the motion for new trial that she did not know that the tape of Reedy's statement to Detective Foster would be played for the jury that day, which is the reason she did not request that Reedy remain in the courtroom.

Even if we presume that trial counsel's failure to subpoena Reedy so that she could be impeached with the statement to Dowell constituted deficient performance, to show the prejudicial effect of her failure to call Reedy, "[Chatman] is required to make an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of his case."[20] Chatman has not made that affirmative showing. Even though the tape of the conversation was not introduced into evidence, Reedy specifically testified about its content on direct examination. Thus, Chatman cannot establish that had counsel impeached Reedy with the tape,

---

[19] *White v. State*, 283 Ga. 566, 570 (4) (662 SE2d 131) (2008) (where hearsay evidence was cumulative of other admissible testimony, the failure to object thereto does not amount to ineffective assistance).

[20] (Citation and punctuation omitted.) *Wafford v. State*, 283 Ga. App. 154, 156 (1) (d) (640 SE2d 727) (2007).

the critical portions of which were already admitted into evidence, it would have affected the outcome of the case.

(e) Chatman also asserts as ineffective trial counsel's failure to subpoena Dowell to lay a foundation to introduce Reedy's prior inconsistent statement. However, as stated above, Reedy testified about her statement to Dowell that Chatman may not have been the perpetrator. Therefore, even had Dowell been called to lay a foundation for the introduction of the tape into evidence, the actual recording would have been cumulative of Reedy's testimony. Thus, again, Chatman has failed to show prejudice.[21]

(f) Chatman maintains that counsel was ineffective because she failed to understand the contemporaneous objection rule. But Chatman has not pointed to any evidence that was erroneously admitted because of trial counsel's deficient performance. Therefore, Chatman has not shown that a reasonable probability exists that trial counsel's failure to object properly resulted in the admission of evidence, which if excluded, would have resulted in a different outcome.

(g) Lastly, Chatman argues that his trial counsel was ineffective because she had conversations with her client in open court, which the jury could hear. Chatman does not point us to any evidence in the record that whatever was said between Chatman and trial counsel was heard by the jury and prejudiced his case. Instead, Chatman refers us to trial counsel's testimony that she was trying to get Chatman to lower his voice after being warned a few times that they could be heard, and that she finally went into a private area with Chatman when he continued to be loud. Chatman argues, summarily, that this testimony evidences counsel's lack of understanding of basic trial procedures and warrants a finding of ineffectiveness. Because Chatman has not shown prejudice, however, we find no error.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED SEPTEMBER 28, 2010.

*Jackson & Schiavone, George T. Jackson*, for appellant.
*Larry Chisolm, District Attorney, Cecelia Harris, Assistant District Attorney*, for appellee.

---

[21] See *Jefferies v. State*, 267 Ga. App. 694, 697 (1) (600 SE2d 753) (2004).