**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 22, 2013**

# In the Court of Appeals of Georgia

A12A2218. AGUILERA v. THE STATE.

BRANCH, Judge.

Anselmo Duarte Aguilera was tried by a Gwinnett County jury and convicted of trafficking in cocaine.[1] He now appeals from the denial of his motion for a new trial, asserting that the trial court erred in admitting certain hearsay evidence and that the evidence is insufficient to sustain his conviction. We find no error and affirm.

On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict. *Martinez v. State*, 306 Ga. App. 512, 514 (702 SE2d 747) (2010). So viewed, the record shows that in 2008 and 2009 a joint task force, made up of both federal and state law enforcement authorities, was conducting

---

[1] OCGA § 16-13-31 (a) (1).

an investigation into a large drug trafficking organization operating in the metropolitan Atlanta area. A major target of the investigation was Soccoro Hernandez-Rodriguez, known as "Soco," a high-level member of the organization.

The task force was able to obtain a warrant to tap Soco's cell phone; all calls coming to and being made from that number were monitored and, if the call pertained to drug-related activity, the conversation was recorded and transcribed. On October 16 or 17, 2009, the task force received information indicating that Soco was expecting a large shipment of drugs. In response to this information, agents set up surveillance in the area of Indian Trail and Dickens Roads in Gwinnett County on October 17, the location being chosen based upon the GPS coordinates of Soco's cell phone and the fact that one of his "stash houses"[2] was located in that area. Shortly before 2:00 p.m., the task force intercepted a phone call to Soco from another drug trafficker, known only as Titin. A transcript of that call was introduced at trial and read for the jury. During the call, the men negotiated Titin's purchase of two kilograms of cocaine from

---

[2] Testimony at trial established that a stash house was either a residence or a commercial building used by drug traffickers to store their drugs and their cash. The task force had identified several stash houses used by Soco, and had identified the house on Dickens Road as a "transaction house," meaning that it was a location used to facilitate the actual sale of narcotics.

Soco.[3] Titin indicated that he would have a runner[4] pick up the drugs, and Soco told him that the runner should meet Soco at a Shell gas station located at the intersection of Indian Trail Road and I-85. The men also agreed that the drugs would be exchanged via a vehicle swap, meaning that after Titin's runner arrived at the designated location, Soco would trade cars with him, leave, and return with drugs in the runner's car. The men would then swap vehicles a second time, and Titin's runner would leave with the drugs, without ever actually having handled them.[5] Soco and Titin further agreed that Titin would pay Soco for the drugs at a later time.

After hearing this call, the task force immediately placed surveillance teams in the area of the Shell station. Task force agents observed a green Honda Element parked at the gas station and occupied by two Hispanic males, neither of whom exited

---

[3] The men negotiated the transaction using certain code words commonly utilized by drug traffickers to refer to narcotics ("material" or "product"), kilograms ("keys" or "kids"), and money ("tickets"). Testimony identifying and explaining those code words was introduced at trial.

[4] Testimony at trial showed that runners are the members of a drug trafficking organization who facilitate drug transactions by ferrying the money and/or drugs necessary for those transactions.

[5] A DEA agent testified that vehicle swapping was a common method used by drug traffickers to facilitate the clandestine exchange of drugs and/or money.

the car for a period of approximately 25 minutes. Aguilera was later identified as the driver of the Honda and his co-defendant was identified as the passenger.

At 2:01 p.m., agents intercepted a call that Titin placed to Soco, informing him that "[t]he guy will be there in ten short minutes." Approximately fifteen minutes later, Titin called Soco again and told him "[t]he guy is there. Write down the number . . ."; Titin then provided Soco with a telephone number. A little more than half an hour after that call, Soco received a phone call from an unidentified male who informed Soco that he was at the Shell station and asking Soco where he should go from there; Soco responded that the man should wait for him at the gas station. A short time later, agents observed a black Toyota Celica, in which Soco was riding as a passenger, pull into the parking lot of the Shell station. At about this same time, the task force intercepted a phone call from Soco to the telephone number used by the unidentified male, during which Soco identified his car and told the male that he should follow Soco's car. Agents at the scene observed the Toyota wait as Aguilera pulled the Honda out of its parking space to follow the Toyota. Both cars then proceeded onto Indian Trail Road, with the Honda following behind the Toyota.

The two cars drove a short distance to a small shopping center that was located less than a mile from Soco's Dickens Road stash house. Both cars parked at the

shopping center and the drivers and passengers all exited their vehicles. Agents then observed Soco and Aguilera in a "face-to-face" conversation, with Aguilera's co-defendant standing next to him. Soco and his driver then entered the Honda and drove it away from the shopping center. After waiting a few minutes, Aguilera drove the Toyota to the back of one of the shopping center's businesses. Approximately nine minutes later, Soco and his driver returned with the Honda. The men then switched cars for a second time; Aguilera and his co-defendant left in the Honda and Soco and his driver left in the Toyota.

When the Honda left the shopping center, task force agents followed it as it entered onto I-85. After traveling several miles, Aguilera and his co-defendant apparently began to suspect they were being tailed, as Aguilera exited I-85 and began to drive the car erratically, in an apparent attempt to evade the agents. Aguilera eventually drove the car into the parking lot of a fast food restaurant, where he and his co-defendant abandoned it and ran into a nearby bowling alley. Officers located both men in the bowling alley, and after they returned Aguilera and his co-defendant to the Honda, two drug dogs performed a free air sniff around the car. The dogs indicated that narcotics were present in the back of the car, behind the driver's seat. Agents then opened the car and found a grocery bag on the floor behind the driver's seat that

5

contained a cereal box. Inside the box were two packages of cocaine, each weighing approximately 1 kilogram.

Following the discovery of the cocaine, Aguilera and his co-defendant were arrested. During a search of his person incident to arrest, agents discovered that the co-defendant was carrying a cell phone that was assigned the phone number from which the previously unidentified male had called Soco. In the phone's contact list, agents found stored the phone numbers of both Soco and Titin. During their search of Aguilera, agents found the keys to the Honda and a cell phone. The phone number assigned to Aguilera's cell phone was the same number that Titin had given to Soco as the contact number for Titin's "guy" waiting at the gas station. Stored in the phone's contact list was Titin's phone number.

During an interview following his arrest, Aguilera denied any knowledge of the cocaine and told police that he had been instructed to pick up the Honda from a business on Indian Trail Road and drive it to a Mexican restaurant on Roswell Road, near I-285. Aguilera, however, could not explain to police how he had gotten to Indian Trail Road to pick up the Honda, could not say who had sent him to retrieve the Honda, and claimed not to know the name of his passenger.

Two days after Aguilera's arrest, the task force concluded its investigation by arresting approximately 45 individuals associated with this particular drug trafficking operation, including Soco. At the time of his arrest, Soco had in his possession the cell phone from which the intercepted calls were made and received. Stored in the contacts of Soco's cell phone was Aguilera's phone number, under the name Gua D Titin. A DEA agent testified that the word "gua" was Spanish, the literal translation of which was "guy" or "dude." He further explained that drug traffickers used this word to refer to an individual who served as a runner for or otherwise worked for another member of their organization. Thus, the name Gua D Titin would translate into worker or runner of Titin.

After his conviction, Aguilera filed a motion for a new trial, which was denied. This appeal followed.

1. Aguilera argues that the trial court erred when it admitted the transcripts of phone calls between Soco and Titin and between Soco and Aguilera's co-defendant, because such evidence constituted hearsay. We find no error, because these statements fall within an exception to the hearsay rule.

OCGA § 24-3-5 provides that "[a]fter the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal

project shall be admissible against all."[6] Aguilera argues that no conspiracy existed because the transaction at issue was a "buy-sell transaction," in which Soco sought to sell and Titin sought to purchase drugs. Under Georgia law, "the mere agreement of one person to buy contraband which another agrees to sell does not establish that the two acted in concert so as to support a finding of conspiracy[,]" because the buyer and seller "are not acting together to commit the same crime. In such circumstance, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective." (Punctuation and footnotes omitted.) *Pruitt v. State*, 264 Ga. App. 44, 47 (2) (589 SE2d 864) (2003). Citing this principle, Aguilera asserts there was no conspiracy and that the transcripts of the intercepted conversations were therefore inadmissible.

As a threshold matter, we note that "[t]he question of the existence of a conspiracy is ultimately for the jury to determine." (Citation and punctuation omitted.) *Aguilera v. State*, 293 Ga. App. 523, 526 (2) (667 SE2d 378) (2008). And here the trial court properly instructed the jury that it must determine whether a conspiracy existed; that if the existence of a conspiracy was proved beyond a reasonable doubt

---

[6] OCGA § 24-3-5 was in effect at the time of Aguilera's trial. Effective Janury 1, 2013, this code provision was replaced by OCGA § 24-8-801 (d) (2) (E) which provides, in relevant part, that the following evidence shall not be excluded under the hearsay rule: "[a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy . . . ."

by evidence other than the declarations of the co-conspirators, the jury could consider the statements made by any co-conspirator; and that if the jury found that either of the defendants was not a part of the conspiracy, then they were to disregard any co-conspirator statements made out of the presence of that defendant. Thus, the question for us to determine is whether the trial court erred in finding that the evidence would support a finding of conspiracy, such that the statements at issue should be admitted for consideration by the jury. We find no such error.

Evidence will support a finding of conspiracy with respect to a buy-sell transaction involving drugs where the seller "fronts" the drugs to the buyer, i.e., supplies the drugs without first receiving payment, with the expectation that the buyer then will re-sell the drugs and pay the original seller from the proceeds. *Melesa v. State*, 314 Ga. App. 306, 308 (724 SE2d 30) (2012). Under such circumstances, the original seller "retains a sufficient interest in the subsequent sale to establish that he acted in concert with the recipient to distribute the contraband." (Citation and punctuation omitted.) Id. Here the evidence showed that Soco had fronted the drugs to Titin, in that he had provided the drugs to him on the promise of future payment. Furthermore, following the arrest of Aguilera and his co-defendant, the task force intercepted conversations between Titin and Soco in which the men discussed who

should bear the financial loss resulting from the seizure of the cocaine. This evidence showed that even after he provided the cocaine to Titin, Soco retained a sufficient interest in the contraband and its subsequent sale to support a finding that he was acting in concert with Titin to distribute the same. See *Melesa*, supra, 314 Ga. App. at 309; *Peacock v. State*, 301 Ga. App. 873, 875 (2) (689 SE2d 853) (2010). The evidence also supported the inference that Aguilera and his co-defendant were part of this conspiracy, i.e., that they were acting in concert with Soco and Titin to facilitate the sale, purchase, possession, and transportation of a large quantity of cocaine. See *Mosley v. State*, 296 Ga. App. 746, 751-752 (4) (675 SE2d 607) (2009). And the statements made by Soco, Titin, and Aguilera's co-defendant over the telephone were made in furtherance of that conspiracy. Accordingly, these statements did not constitute hearsay and the trial court did not err in admitting them.

2. Aguilera also claims that the evidence was insufficient to sustain his conviction. With respect to this claim of error,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In determining that question, we consider the inferences that can be logically derived from the evidence presented at trial. As long as there is some competent evidence, even though contradicted, to support each

10

fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citation and footnote omitted.) *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010).

To convict Aguilera of trafficking in cocaine, the State was required to prove that he knowingly possessed 28 grams or more of cocaine. OCGA § 16-13-31 (a) (1). Aguilera argues that the State failed to prove that he knowingly possessed the cocaine. We disagree.

Where contraband is found in a vehicle being driven by the defendant "the State is generally entitled to an evidentiary presumption that the [defendant, as the] driver of the automobile is in constructive possession of the contraband." (Citation, punctuation and footnote omitted.) *Feliciano v. State*, 302 Ga. App. 328, 331 (690 SE2d 680) (2010). And "[w]hether the evidence presented at trial supported or rebutted that presumption [is] a question for the jury." (Citation omitted.) *Navarro v. State*, 293 Ga. App. 329, 331 (667 SE2d 125) (2008).

With respect to Aguilera's knowledge of the cocaine in the backseat of his car, "[i]t has long been the law that knowledge may be proved by facts and circumstances from which a jury could reasonably infer that a defendant knowingly possessed

11

contraband." (Citations and punctuation omitted.) *Richardson v. State*, 305 Ga. App. 363, 365 (1) (699 SE2d 595) (2010). Here, the jury could infer Aguilera's knowledge from the evidence showing that he had been sent by Titin to obtain the drugs from Soco and ferry them back to Titin; that Aguilera attempted to evade the police; and that when interviewed by the police Aguilera professed to be unable to give them any information to support his claim that he had been instructed to pick up the Honda at one location and drive it to another. See *Feliciano*, supra at 331 (defendant's knowledge of contraband found in hidden compartment of car he was driving supported by fact that he and passenger gave conflicting stories to police about ownership of vehicle); *Arellano v. State*, 289 Ga. App. 148, 150 (1) (a) (656 SE2d 264) (2008) (fact that defendant attempted to evade police served to demonstrate that he had knowledge of contraband in car he was driving). Accordingly, the evidence sufficed to sustain Aguilera's conviction for trafficking in cocaine.

*Judgment affirmed. Miller, P. J., and Ray, J., concur.*

12