**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 27, 2013**

# In the Court of Appeals of Georgia

A13A0194. HERNANDEZ-GARCIA v. THE STATE.

BRANCH, Judge.

Ublester Hernandez-Garcia was tried by a Gwinnett County jury and convicted of trafficking in cocaine.[1] He now appeals from the denial of his motion for a new trial, asserting that the trial court erred in admitting certain hearsay evidence and in charging the jury on the definition of trafficking. Hernandez-Garcia further claims that the evidence is insufficient to sustain his conviction and that he received ineffective assistance of counsel. We find no error and affirm.

Hernandez-Garcia was tried together with Anselmo Duarte Aguilera, whose conviction we recently affirmed. See *Aguilera v. State*, 320 Ga. App.707 (740 SE2d 644) (2013). Many of the relevant facts are set forth in that opinion, as follows:

---

[1] OCGA § 16-13-31 (a) (1).

[I]n 2008 and 2009 a joint task force, made up of both federal and state law enforcement authorities, was conducting an investigation into a large drug trafficking organization operating in the metropolitan Atlanta area. A major target of the investigation was Soccoro Hernandez-Rodriguez, known as "Soco," a high-level member of the organization.

The task force was able to obtain a warrant to tap Soco's cell phone; all calls coming to and being made from that number were monitored and, if the call pertained to drug-related activity, the conversation was recorded and transcribed. On October 16 or 17, 2009, the task force received information indicating that Soco was expecting a large shipment of drugs. In response to this information, agents set up surveillance in the area of Indian Trail and Dickens Roads in Gwinnett County on October 17, the location being chosen based upon the GPS coordinates of Soco's cell phone and the fact that one of his "stash houses"[2] was located in that area. Shortly before 2:00 p.m., the task force intercepted a phone call to Soco from another drug trafficker, known only as Titin. A transcript of that call was introduced at trial and read for the jury. During the call, the men negotiated Titin's purchase of two kilograms of cocaine from Soco.[3]

---

[2] Testimony at trial established that a stash house was either a residence or a commercial building used by drug traffickers to store their drugs and their cash. The task force had identified several stash houses used by Soco, and had identified the house on Dickens Road as a "transaction house," meaning that it was a location used to facilitate the actual sale of narcotics.

[3] "The men negotiated the transaction using certain code words commonly utilized by drug traffickers to refer to narcotics ('material' or 'product'), kilograms ('keys' or 'kids'), and money ('tickets'). Testimony identifying and explaining those code words was introduced at trial."

2

Titin indicated that he would have a runner[4] pick up the drugs, and Soco told him that the runner should meet Soco at a Shell gas station located at the intersection of Indian Trail Road and I-85. The men also agreed that the drugs would be exchanged via a vehicle swap, meaning that after Titin's runner arrived at the designated location, Soco would trade cars with him, leave, and return with drugs in the runner's car. The men would then swap vehicles a second time, and Titin's runner would leave with the drugs, without ever actually having handled them.[5] Soco and Titin further agreed that Titin would pay Soco for the drugs at a later time.

After hearing this call, the task force immediately placed surveillance teams in the area of the Shell station. Task force agents observed a green Honda Element parked at the gas station and occupied by two Hispanic males, neither of whom exited the car for a period of approximately 25 minutes. Aguilera was later identified as the driver of the Honda and [Hernandez-Garcia] was identified as the passenger.

At approximately 2:01 p.m. agents intercepted a call that Titin placed to Soco, informing him that "the guy is there. Write down the number . . ."; Titin then provided Soco with a telephone number. A little more than half an hour after that call, Soco received a phone call from an

---

[4] "Testimony at trial showed that runners are the members of a drug trafficking organization who facilitate drug transactions by ferrying the money and/or drugs necessary for those transactions."

[5] "A DEA agent testified that vehicle swapping was a common method used by drug traffickers to facilitate the clandestine exchange of drugs and/or money."

unidentified male who informed Soco that he was at the Shell station and asking Soco where he should go from there; Soco responded that the man should wait for him at the gas station. A short time later, agents observed a black Toyota Celica, in which Soco was riding as a passenger, pull into the parking lot of the Shell station. At about this same time, the task force intercepted a phone call from Soco to the telephone number used by the unidentified male, during which Soco identified his car and told the male that he should follow Soco's car. Agents at the scene observed the Toyota wait as Aguilera pulled the Honda out of its parking space to follow the Toyota. Both cars then proceeded onto Indian Trail Road, with the Honda following behind the Toyota.

*Aguilera*, supra at 708-709.

The two cars drove a short distance to a small shopping center, located less than a mile from Soco's Dickens Road stash house. Both cars parked at the shopping center and the drivers and passengers all exited their vehicles. Agents then observed Hernandez-Garcia standing next to Aguilera while Aguilera and Soco engaged in a "face to face" conversation. Soco and his driver then entered the Honda and drove it away from the shopping center; they returned with the car less than ten minutes later. After the men switched cars for a second time, Hernandez-Garcia and Aguilera left in the Honda and Soco and his driver left in the Toyota.

4

When the Honda left the shopping center, task force agents followed it as it entered onto I-85. After traveling several miles, Hernandez-Garcia and Aguilera apparently began to suspect they were being tailed and they exited I-85. Aguilera then began to drive the car erratically, in an apparent attempt to evade the agents. The men eventually drove into the parking lot of a fast food restaurant, where they abandoned the car and ran into a nearby bowling alley. Officers located both men in the bowling alley and after they returned Hernandez-Garcia and Aguilera to the Honda,

> two drug dogs performed a free air sniff around the car. The dogs indicated that narcotics were present in the back of the car, behind the driver's seat. Agents then opened the car and found a grocery bag on the floor behind the driver's seat that contained a cereal box. Inside the box were two packages of cocaine, each weighing approximately 1 kilogram.

Id. at 710.

Following the discovery of the cocaine, Hernandez-Garcia and his co-defendant were arrested. During a search of his person incident to arrest, agents discovered that Hernandez-Garcia was carrying a cell phone that was assigned the phone number from which the previously unidentified male had called Soco. In the phone's contact list, agents found stored the phone numbers of both Soco and Titin. Agents also found a cell phone during their search of Aquilera. The phone number assigned to the

5

Aquilera's cell phone was the same number that Titin had given to Soco as the contact number for Titin's "guy" waiting at the gas station. Stored in the phone's contact list was Titin's phone number.

During an interview following his arrest, Hernandez-Garcia initially gave police a false name, told them he could not remember his address, and denied any knowledge of the cocaine. After admitting his real name, Hernandez-Garcia told police that he had been instructed to pick up the Honda at the Indian Trail Road exit on I-85. He could not, however, identify the person from whom he was supposed to pick up the car, could not say what he was supposed to do with the car after he picked it up, and claimed not to know the name of the car's driver, with whom he had been riding.

Two days after Hernandez-Garcia's arrest the task force concluded its investigation by arresting approximately 45 individuals associated with this particular drug trafficking operation, including Soco. At the time of his arrest, Soco had in his possession the cell phone from which the intercepted calls were made and received. Stored in the contacts of Soco's cell phone was Aguilera's phone number.[6]

---

[6] This phone number was stored under the name Gua D Titin. A DEA agent testified that the word "gua" was Spanish, the literal translation of which was "guy" or "dude." He further explained that drug traffickers used this word to refer to an individual who served as a runner for or otherwise worked for another member of their organization. Thus, the name Gua D Titin would translate into worker or runner of Titin.

After his conviction, Hernandez-Garcia filed a motion for a new trial, which was denied. This appeal followed.

1. Hernandez-Garcia argues that the trial court erred when it admitted the transcripts of phone calls between Soco and Titin and between Soco and himself, because such evidence constituted hearsay. We find no error because, as we explained previously, these statements fall within an exception to the hearsay rule.[7] See *Aguilera*, supra at 711-712 (1). Specifically, we held that the evidence presented at trial supported a finding of conspiracy, given that it

> showed that Soco had fronted the drugs to Titin [and] that even after he provided the cocaine to Titin, Soco retained a sufficient interest in the contraband and its subsequent sale to support a finding that he was acting in concert with Titin to distribute the same. See *Melesa [v. State]*, . . . 314 Ga. App. [306,] 309 (724 SE2d 30) (2012); *Peacock v. State*, 301 Ga. App. 873, 875 (2) (689 SE2d 853) (2010). The evidence also supported the inference that [Hernandez-Garcia] and his co-defendant were part of this conspiracy, i.e., that they were acting in concert with

[7] OCGA § 24-3-5 provides that "[a]fter the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." This statute was in effect at the time of Hernandez-Garcia's trial. Effective January 1, 2013, this code provision was replaced by OCGA § 24-8-801 (d) (2) (E) which provides, in relevant part, that the following evidence shall not be excluded under the hearsay rule: "[a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy. . . ."

7

Soco and Titin to facilitate the sale, purchase, possession, and transportation of a large quantity of cocaine. See *Mosley v. State*, 296 Ga. App. 746, 751-752 (4) (675 SE2d 607) (2009). And the statements made by Soco, Titin, and [Hernandez-Garcia] over the telephone were made in furtherance of that conspiracy.

Id. Because the fact of a conspiracy was proved, these statements did not constitute hearsay, and the trial court did not err in admitting them.

2. Hernandez-Garcia further contends that the trial court erred in charging the jury on the definition of trafficking, because the charge allowed the jury to convict him of the offense of trafficking by a method not alleged in the indictment. As Hernandez-Garcia acknowledges, however, he did not object to the jury charge at trial. Thus, the charge will provide a grounds for reversal only if it constitutes "plain error." *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011); OCGA § 17–8–58 (b). To demonstrate plain error with respect to a jury charge, it must be shown that the instruction was erroneous, that the error was obvious, and that there is a reasonable probability that the erroneous instruction affected the outcome of trial. Id. at 33 (2) (a).

The indictment in this case charged Hernandez-Garcia with trafficking in cocaine by knowingly possessing 400 grams or more of a mixture containing at least

10% cocaine. In defining the offense of trafficking for the jury, however, the court charged the trafficking statute[8] in its entirety, instructing the jury that

> [t]he offense charged in Count 1 . . . is a violation of the Georgia Controlled Substances Act, trafficking in cocaine, which provides that any person who knowingly sells, delivers, or brings into this state, or who is knowingly in possession of 400 grams or more of cocaine, or . . . any mixture with a purity of 10 percent or more of cocaine[,] commits the offense of trafficking in cocaine.

As a general rule, a trial court does not err when it charges a code section in its entirety, even though some part of that section may be inapplicable to the allegations of the indictment and the evidence presented at trial. *Perguson v. State*, 221 Ga. App. 212, 213 (1) (470 SE2d 909) (1996). In such circumstances, error will be found only where it appears that the inapplicable part of the charged statute either "misled the jury or erroneously affected the verdict." (Citation and punctuation omitted.) *Gibson v. State*, 283 Ga. 377, 381 (7) (659 SE2d 372) (2008). For the jury charge at issue to constitute reversible error, therefore, there must be a reasonable possibility that, as a result of the charge, the jury convicted Hernandez-Garcia of the offense of trafficking

---

[8] OCGA § 16-13-31 (a).

in cocaine in a manner not alleged in the indictment. *Tidwell v. State*, 312 Ga. App. 468, 472 (2) (718 SE2d 808) (2011).

Here, there was no evidence introduced at trial suggesting that Hernandez-Garcia brought the cocaine at issue into the state, that he sold it, or that he delivered it to anyone. Rather, the evidence showed only that he was in knowing possession of the cocaine for a brief period of time. Given these circumstances, we find no reasonable possibility that the jury convicted Hernandez-Garcia of trafficking in a manner not charged in the indictment, and therefore we find no plain error in the jury charge. See id. (indictment charged defendant with intentionally terrorizing the victim; in instructing the jury, the trial court charged the entire code section, which provided that a defendant violated the statute when he acted with the intent to terrorize or with reckless disregard of the risk of causing terror; given that all the evidence showed that defendant acted intentionally rather than recklessly, there was no error in the charge); *Green v. State*, 310 Ga. App. 874, 875-876 (1) (714 SE2d 646) (2011) (where indictment charged defendant with committing armed robbery by use of a gun, and all the evidence supported the conclusion that he used an actual handgun, there was no error in the trial court's charging of the entire armed robbery code section, which provided that the crime could be committed with a gun or "by the use of . . . any

10

replica, article or device having the appearance of [a gun]") (punctuation and footnote omitted).

3. Hernandez-Garcia also asserts that the evidence was insufficient to sustain his conviction. With respect to this claim of error,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In determining that question, we consider the inferences that can be logically derived from the evidence presented at trial. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citation, punctuation and footnote omitted.) *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010).

Hernandez-Garcia argues that the State failed to prove that he knowingly possessed the cocaine found in the Honda. We disagree.

As we explained previously, "it has long been the law that knowledge may be proved by facts and circumstances from which a jury could reasonably infer that a defendant knowingly possessed contraband." (Citation and punctuation omitted.) *Aguilera*, supra at 713 (2). Thus, the jury could infer Hernandez-Garcia's knowledge

11

of cocaine possession from the evidence showing that he and his co-defendant had been sent by Titin to obtain the drugs from Soco and ferry them back to Titin; that Hernandez-Garcia attempted to evade the police; and that when interviewed by the police, Hernandez-Garcia initially gave them a false name, refused to provide them with his address, and professed to be unable to give them any information to support his claim that he had merely been instructed to pick up the Honda at the Indian Trail exit. See *Feliciano v. State*, 302 Ga. App. 328, 331 (690 SE2d 680) (2010) (defendant's knowledge of contraband found in hidden compartment of car he was driving supported by fact that he and passenger gave conflicting stories to police about ownership of vehicle and about their destination); *Arellano v. State*, 289 Ga. App. 148, 150 (1) (a) (656 SE2d 264) (2008) (fact that defendant attempted to evade police served to demonstrate that he had knowledge of contraband in car he was driving). Accordingly, the evidence established that Hernandez-Garcia was in knowing possession of the cocaine and, therefore, sufficed to sustain his conviction for trafficking in the drug.

4. Finally, Hernandez-Garcia claims that he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance, Hernandez-Garcia bears the burden of proving both that the performance of his lawyer was deficient and that he

12

suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If Hernandez-Garcia cannot meet his burden of proving either prong of the *Strickland* test, then we need not examine the other prong. *Battles v. State*, 290 Ga. 226, 229 (2) (719 SE2d 423) (2011).

(a) Hernandez-Garcia first argues that trial counsel performed deficiently when he failed to object to the audio recording and transcripts of the phone calls between Soco and the unidentified male on the grounds that there was no witness qualified to authenticate the voices heard on those telephone calls. Specifically, Hernandez-Garcia argues that because no witness was qualified to testify as to whether the voice of the unidentified male heard on the recording was, in fact, his voice, trial counsel should have objected to the admission of the recording and the transcript on that basis. We disagree.

It is well-established that in cases where the perpetrator has been heard but not seen, the State may identify the defendant as the perpetrator through voice identification testimony. See *Brown v. State*, 278 Ga. 369, 369-370 (602 SE2d 834) (2004); *Smith v. State*, 275 Ga. 326, 327 (2) (565 SE2d 453) (2002). And where the State seeks to prove the defendant's guilt through voice recognition, the witness

13

identifying the speaker's voice as belonging to the defendant must have some basis for doing so. *Brown*, supra at 370-371 (2) (trial court correctly allowed victim to testify that the voice of an assailant she heard but did not see belonged to the defendant, where testimony concerning voice identification was based on victim's previous interactions with defendant and knowledge of her voice). Compare *Patterson v. State*, 287 Ga. App. 100, 101 (1) (650 SE2d 770) (2007) (officer could not testify as to telephone conversation he heard between confidential informant and someone who purported to be defendant; police officer did not know defendant and was therefore unable to say that it was, in fact, defendant speaking on the other end of the telephone line). Here, however, the State did not seek to prove that Hernandez-Garcia was the unidentified male heard speaking with Soco based on voice recognition. Rather, the State relied on the evidence of Hernandez-Garcia's possession of the cell phone used by the unidentified male to contact Soco to prove that Hernandez-Garcia was the unidentified male involved in the conspiracy. Accordingly, because it did not rely on voice identification to establish Hernandez-Garcia's guilt, the State was not required to offer voice authentication testimony. Rather, for the recordings at issue to be admissible, the State only had to authenticate the recordings themselves, rather than any voices heard on the tapes.

14

Here, the witness called by the State to authenticate the recordings and the transcripts testified that she had heard the conversations as they occurred and were recorded; that she had transcribed the conversations as she heard them and as they were being recorded; and that the transcripts accurately reflected the recorded conversations. Thus, this witness successfully authenticated both the recordings and the transcripts. See, e.g., *Barnes v. State*, 230 Ga. App. 884, 885 (2) (497 SE2d 594) (1998). The witness further testified as to the phone numbers the different calls were made from and to, and she identified one of those numbers as belonging to Soco and another as belonging to Titin. She also testified as to the phone number used by the unidentified male when he spoke with Soco. Other evidence showed that the cell phone found on Hernandez-Garcia's person at the time of his arrest was assigned the phone number used by the unidentified male. Thus, the evidence supported the inference that Hernandez-Garcia was the unidentified male that spoke with Soco. In light of that evidence, and given that the State did not rely on voice recognition to identify Hernandez-Garcia as the unidentified male heard speaking on the recording, trial counsel had no basis for objecting to this evidence on the grounds that no witness had authenticated Hernandez-Garcia's voice. It follows, therefore, that trial counsel was not ineffective for failing to offer such an objection. See *Vaughn v. State*, 301 Ga.

15

App. 55, 60 (5) (a) (686 SE2d 847) (2009) ("[f]ailure to make a meritless or futile objection or motion cannot be evidence of ineffective assistance") (citation and punctuation omitted).

(b) Hernandez-Garcia further contends that trial counsel was ineffective for failing to object to the jury charge on trafficking. As discussed in Division 2, however, there was no error in the charge. Trial counsel's failure to object, therefore, did not constitute deficient performance. Id. Moreover, given our holding in Division 2 that there is no reasonable possibility that the charge affected the outcome at trial, Hernandez-Garcia cannot show that he was prejudiced by his counsel's failure to object to that charge. See *Williams v. State*, 290 Ga. 533, 538 (2) (c) (722 SE2d 847) (2012).

*Judgment affirmed. Ellington, C. J., and Phipps, P. J., concur.*