**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 20, 2013**

# In the Court of Appeals of Georgia

A13A1575. MALDONADO v. THE STATE.
A13A1812. DURON v. THE STATE.

BOGGS, Judge.

David Ada Maldonado and Carlos Humberto Duron were convicted, along with two other individuals, of trafficking in cocaine. Their amended motions for new trial were denied, and they appeal. Finding no error, we affirm.

1. Maldonado and Duron assert that the evidence was insufficient to support their convictions. When reviewing the sufficiency of the evidence,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

> Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence shows that the Atlanta High Intensity Drug Trafficking Area Task Force set up a controlled buy via a confidential informant and an undercover officer, who was wearing a hidden microphone monitored by other officers. After the deal was set up at a gas station with an intermediary, Maldonado and his sister, co-defendant Meyssi Aryani Saavedra-Maldonado, who was living with Duron, arrived in a white Tahoe with a Hardy Chevrolet drive-out tag. The informant and the undercover officer followed the white Tahoe into a nearby gated apartment complex, where Maldonado parked the Tahoe near building 300 and got out, while Saavedra-Maldonado spoke with the informant. Saavedra-Maldonado then drove away in the Tahoe, while Maldonado remained talking with the informant and the undercover officer for about half an hour, after which the informant and the officer drove to a nearby convenience store to wait and Maldonado walked between

2

building 300 and building 400. Other officers monitoring the exchange saw a black Avalanche with a Hardy Chevrolet drive-out tag drive through the complex.

The informant and officer drove back to building 300, and Saavedra-Maldonado returned in the white Tahoe, followed by a gold Expedition driven by co-defendant Francis Perdomo and owned by Maldonado. Saavedra-Maldonado walked over to the Expedition carrying a black purse, spoke briefly with Perdomo, and then opened the rear passenger door of the Tahoe and "messed around" with something on the floor. Perdomo, Saavedra-Maldonado, the undercover officer, and the informant all gathered at the rear passenger door, the officer sat in the rear seat, and a brief conversation was held in Spanish about the money for the sale. Translated transcripts of these conversations were admitted into evidence, and the speakers were identified.

Suddenly, Perdomo and Saavedra-Maldonado called the deal off. Perdomo left hurriedly and was arrested at a nearby WalMart. The undercover officer and the informant then left, while Saavedra-Maldonado remained sitting in the driver's seat of the Tahoe. She looked into the rear passenger seat, then walked "in a hurried fashion" into the breezeway between building 300 and building 400; a few minutes later, Maldonado followed her.

Shortly afterwards, Maldonado walked out of building 300, opened the rear passenger door of the Tahoe, looked inside, closed the door, got into the driver's seat, and drove away. He went to a nearby strip mall, parked, and spent 18 minutes walking up and down the storefronts. Duron then drove up in a black Avalanche with a Hardy Chevrolet drive-out tag, and pulled in behind the Tahoe. Maldonado got out of the Tahoe with the black purse, handed it to Duron, and got into the Avalanche. Duron walked to the rear passenger window of the Tahoe, looked in, then got back in the Avalanche and left with Maldonado in the passenger seat.

Duran drove a short distance, made an abrupt U-turn, encountered a surveillance officer, and fled at speeds in excess of 100 miles per hour. An aircraft was assisting with surveillance, however, and officers were able to follow Duron and Maldonado as they drove to a Waffle House 26 miles away.

An investigator arrived at the Waffle House in time to see Duron and Maldonado go inside, Maldonado carrying the black purse. After six minutes, Duron left in the Avalanche and the investigator followed him until another officer could take up the pursuit. He then returned to the Waffle House and spoke with Maldonado, who had the same black purse on a table. Maldonado consented to a search; the purse

4

contained two wallets belonging to Maldonado, a wallet belong to Perdomo, and a prescription bottle with Duron's name on it.

Maldonado claimed that a stranger gave him the purse. He had a car key in his jacket pocket, but said he had borrowed the jacket from another stranger and did not know what car the key belonged to. He told the investigator that he arrived at the Waffle House by taxi and that he was staying at a hotel, though he had no room key. Maldonado was arrested and taken to where the other officer had stopped Duron. Asked who Duron was, he shrugged his shoulders "as if he did not know."

The investigator returned to the white Tahoe with the key he had recovered from Maldonado and unlocked the Tahoe. When he looked inside the rear passenger window, he saw a tightly wrapped package on the rear passenger floor, which he recognized from his experience as a kilogram-size package. This proved to contain a kilogram of cocaine. An apartment in building 300 contained cellular telephones, identification, a checkbook, and bank cards belonging to Saavedra-Maldonado.

After Duron's arrest, search warrants were issued for two adjoining homes in Commerce, Georgia, which he had purchased together. The homes contained documents and other personal items showing that Duron and Saavedra-Maldonado occupied both residences. An insurance bill in Duron's name for coverage on both the

5

white Tahoe and the black Avalanche was found in one home, along with 12 cell phones, two sim cards, and $106,000 in cash. Next door, officers found cocaine, cocaine packaging materials, $23,000 in cash, five more cell phones and two sim cards, as well as Saavedra-Maldonado's passport, which was locked in a safe in the master bedroom closet.

The State then obtained court orders to intercept Duron's telephone calls. In August 2009, about nine months after Duron's arrest in the offense charged here, the wiretaps revealed that Duron was involved in another sale of cocaine. He placed approximately 40 calls to set up the deal. Police listened to calls in which Duron discussed the price and quantity of the cocaine and directed various individuals in complex arrangements to move, store and test the cocaine by transferring it to numerous vehicles and safe houses. At one point, Duron commented that he had been "doing nothing" for nine months, since he was arrested. After one of his couriers realized that the police were observing him, Duron made numerous calls making plans to evade the police and hide the cocaine. He directed the courier to wait in a shopping center while he drove there to observe the police and help the courier escape. The courier was arrested, and cocaine was found hidden in the woods nearby.

6

An intelligence analyst with the drug task force was qualified as an expert witness/forensic analyst of telephone data. The analyst testified that she was trained in the use of computer programs, charts, and notebooks used for compiling law enforcement data, as well as databases and other tools used to analyze telephone records obtained from cellular providers. The parties stipulated to the provision of the data from the telephone companies. The analyst described the manner in which her computer programs and equipment were able to extract contact lists, call activity, and text messages from multiple cell phones and analyze that information. The resulting reports show which individuals called other individuals at particular times, and identify "common calls" or telephones in frequent communication with one another.

The analyst testified that her research and analysis led her to conclude that a particular telephone was used by Duron. She explained her findings, memorialized in a chart, to the jury. Similarly, the analyst testified that she was able to compare six cell phones used by Duron with a cell phone used during the drug transaction, and testified that the contact lists contained numerous similarities (such as Duron's father's telephone number) suggesting that Duron used that cell phone as well. Moreover, that cell phone was purchased at the same time and place as a cell phone found in Duron's possession when he was arrested, the subscriber information was

the same for both telephones, and the numbers were one digit apart. Both of those cell phones were used by Duron on the day of the drug transaction, and phone records showed that he made more than 80 telephone calls with Perdomo and Saavedra-Maldonado while the transaction was in progress.[1]

This evidence, construed in favor of the jury's verdict, clearly supported the convictions. See, e.g., *Hernandez-Garcia v. State*, 322 Ga. App. 455, 461-462 (3) (745 SE2d 706) (2013), and *Aguilera v. State*, 320 Ga. App. 707, 713 (2) (740 SE2d 644) (2013), involving a virtually identical scheme.

*Case No. A13A1575*

2. In his other enumeration of error, Maldonado contends the trial court erred in failing to strike Juror No. 11 for cause. In response to a question, this juror testified that her son-in-law's drug problem destroyed her daughter's marriage, but that she "hoped [she] could judge these individuals fairly." Asked if she could judge the case based upon this evidence against these defendants, she responded, "I can." Questioned by defense counsel, she added, "I would believe I could treat it fairly. It's more of an emotional connection than a reasoning." Under very intensive questioning

---

[1]An investigator testified on cross-examination by Maldonado's attorney that the analyst had similarly identified a telephone used by Maldonado, but "we felt that we couldn't 100 percent prove it for the jury, so we opted to take it out."

by Maldonado's counsel, she agreed that there was "some" question or "some" reluctance" whether she could "remain completely neutral and impartial because of the nature of the crime." Maldonado's counsel acknowledged that "she was rehabilitated to a certain extent," but added, "I'm not opposing [the challenge for cause by a co-defendant], but I'm not pushing it, either." The trial court denied the challenge for cause.

In *Leonard v. State*, 292 Ga. 214, 216-217 (3) (735 SE2d 767) (2012), a juror expressed similar reluctance because of her daughter's involvement in drugs and the difficulties it had caused in her family.

> For a juror to be excused for cause, it must be shown that he or she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. A trial court's determination as to whether to strike a juror for cause will not be set aside absent some manifest abuse of the court's discretion. An appellate court must pay deference to the finding of the trial court and this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire. The fact that at some point during voir dire, a prospective juror expressed some doubt as to her own impartiality does not demand as a matter of law that she be excused for cause. The prospective juror's responses do not show that she would be unable to properly serve as a

9

juror, and there was no abuse of discretion in refusing to strike her for cause.

(Citations and punctuation omitted.) Id. Since this was a criminal rather than a civil trial, OCGA § 15-12-164 (a) prescribes the specific questions that must be asked to disqualify jurors in criminal trials. "In order for a potential juror to be excused for cause, the person must be shown to hold an opinion of the guilt or innocence of the defendant that is so fixed and definite that the person will be unable to set the opinion aside and decide the case upon the evidence or the court's charge upon the evidence." (Citations and punctuation omitted.) *Gibson v. State*, 267 Ga. App. 473, 478 (4) (600 SE2d 417) (2004).

Here, as Maldonado's counsel acknowledged, the juror's responses were somewhat ambiguous.

> Given this ambiguity, if the trial court had seen fit to excuse the prospective juror for cause, that would have been a reasonable exercise of its discretion. But that does not mean that it was unreasonable for the trial court to do otherwise. The very notion of discretion implies that reasonable people sometimes will reasonably disagree about what is to be done, and in such a case, that call belongs to the one to whose discretion the question is committed by law. This is such a case, and the discretion here belongs to the trial court.

10

*Edenfield v. State*, 293 Ga. 370, 387-388 (7) (b) (744 SE2d 738) (2013).

Even assuming that Maldonado preserved his challenge to this juror by his ambivalent response to the trial court's inquiry, the trial court did not abuse its discretion in refusing to strike this juror for cause.

*Case No. A13A1812*

3. Duron asserts ineffective assistance of counsel in two respects: that his trial counsel failed to object to a multiple-county wiretap in violation of *Luangkhot v. State*, 292 Ga. 423 (736 SE2d 397) (2013), and that counsel failed to file a timely speedy trial demand under OCGA § 17-7-170.

> To prevail on a claim of ineffective assistance, [Duron] must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984). To show that the performance of his lawyer was deficient, [Duron] must prove that he performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. And to show that he was prejudiced by the performance of his lawyer, [Duron] must prove a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This burden, though not impossible to carry, is a heavy one. An insufficient showing on

11

either *Strickland* prong relieves the reviewing court of the need to address the other prong.

(Citations and punctuation omitted.) *Maurer v. State*, 320 Ga. App. 585, 590-591 (6) (740 SE2d 318) (2013).

(a) Duron was tried and convicted in July 2010, and *Luangkhot* was not decided until 2013. The wiretap statute, OCGA § 16-11-64, has been amended, and at the hearing on the motion for new trial, Duron's trial counsel testified that he and others interpreted the statute, as worded at the time of trial, to authorize multiple-county wiretaps. In fact, this court itself had reached the same conclusion, taking a more expansive view of superior court authority to issue wiretap warrants, but was reversed by the Supreme Court. *Luangkhot v. State*, 313 Ga. App. 599 (722 SE2d 193) (2012).

"[I]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law, and . . . only in a rare case would it be ineffective assistance by a trial attorney not to make an objection that would be overruled under prevailing law." *Rickman v. State*, 277 Ga. 277, 280 (2) (587 SE2d 596) (2003). And

[a]lthough this Court has held that [a new decision] applies to the admission of evidence in cases pending on direct review at the time that opinion was issued, that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, [a new decision] does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued.

(Citation omitted.) *Redwine v. State*, 280 Ga. 58, 62-63 (3) (c) (623 SE2d 485) (2005). "The standard for effectiveness of counsel does not require a lawyer to anticipate changes in the law." (Citation, punctuation, and footnote omitted.) *Hughes v. State*, 266 Ga. App. 652, 655 (3) (a) (598 SE2d 43) (2004). This claim of ineffectiveness is without merit.

(b) In a three-sentence argument, Duron contends that his trial counsel was ineffective in failing to file a timely speedy trial demand. But Duron's speedy trial demand was in fact filed in a timely fashion. OCGA § 17-7-170 (a) requires that a statutory speedy trial demand be filed "at the court term at which the indictment or accusation is filed or at the next succeeding regular court term thereafter." Terms in Gwinnett Superior Court begin on the first Monday in March and June, the second Monday in September, and the first Monday in December. OCGA § 15-6-3 (20).

13

Duron was indicted on January 7, 2010, during the December 2009 term. Therefore, to be effective, Duron's speedy trial demand had to be filed during the December term or at the latest during the March 2010 term; that is, before the June term began on June 7, 2010. It was filed on April 28, 2010, within the March 2010 term, and thus was timely, and Duron was tried during the next succeeding term. See OCGA § 17-7-170 (b). This claim of ineffectiveness is also without merit.

4. Duron next complains that the trial court improperly admitted similar transaction evidence.

> Before evidence of an independent offense may be admitted at trial, the State must establish: (1) that it seeks to introduce the evidence not to raise an improper inference as to the defendant's character but for some proper purpose; (2) that there is sufficient evidence to establish that the defendant committed the independent offense; and (3) that there is a sufficient connection or similarity between the independent offense and the crime charged so that proof of the former tends to prove the latter.

(Citation, punctuation, and footnote omitted.) *Amica v. State*, 307 Ga. App. 276, 282 (3) (a) (704 SE2d 831) (2010). "We accept the trial court's findings of fact unless they are clearly erroneous and will uphold the decision to admit the similar transaction evidence unless there has been an abuse of discretion." *Jackson v. State*, 291 Ga. 54, 55 (2) (727 SE2d 454) (2012). While Duron emphasizes the differences

between the crimes, "a transaction does not have to mirror every detail in order to authorize its admission; rather, the proper focus is upon the similarities between the incidents and not upon the differences." *Lamb v. State*, 273 Ga. 729, 731 (1) (546 SE2d 465) (2001). Moreover, under our former evidence Code, applicable here, when a similar transaction is "offered to prove intent, bent of mind, course of conduct, and common scheme or plan . . . . a lesser degree of similarity is required than when such evidence is introduced to prove identity." (Citations and punctuation omitted.) *Neal v. State*, 290 Ga. 563, 564 (2) (722 SE2d 765) (2012).[2]

Here, while the incidents differ in details, the similarities are almost uncanny, showing elaborate distribution schemes involving multiple locations, "safe houses," vehicles, and couriers, the use of numerous cell phones to direct negotiations and to avoid capture, and the presence of large amounts of cash and cocaine. The trial court did not err in admitting the similar transactions.

---

[2]"We note that for trials conducted after January 1, 2013, the new evidence code permits the admission of similar-transaction evidence for the purpose of proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' but no longer for the purpose of proving 'bent of mind' or 'course of conduct.' OCGA § 24-4-404 (b)." *Betancourt v. State*, 322 Ga. App. 201, 206 n.15 (3) (744 SE2d 419) (2013). This case was tried in 2010.

15

5. Finally, Duron contends the trial court erred in qualifying the forensic analyst and allowing her to testify to matters "within the ken of the jury." "In criminal cases, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-9-67.[3] "Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]" *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981).

> It is for the trial court to determine, as a matter of law after hearing evidence, whether a witness is competent by way of qualifications to render an opinion within their area of expertise. The requirements for qualification as an expert witness are minimal; generally, nothing more is required to qualify an expert than evidence that the person has been educated in a particular trade, science, or profession. Formal education or training in an area of expertise is not necessary, provided the witness possesses the qualifications of such area of expertise through skill and experience. It is the possession of special knowledge derived either from experience, study, or both in a field of expertise that makes one an

---

[3]Except for minor changes in wording, this Code section remains the same under the new evidence Code. See OCGA § 24-7-707.

16

"expert." Thus, an expert witness can express an opinion on a matter which comes within the person's qualifications.

*In the Interest of C. W. D.*, 232 Ga. App. 200, 206-207 (3) (a) (501 SE2d 232) (1998) (individual trained as psychologist qualified as expert, though not licensed in Georgia). See also *O'Donnell v. State*, 200 Ga. App. 829, 833-834 (2) (409 SE2d 579) (1991) (criminal investigator qualified to testify on a question of "trade" under OCGA § 24-9-67 regarding record-keeping practices of drug dealers; trial court did not abuse discretion in admitting conclusory opinion). The witness was examined extensively on her specific training as an analyst of telephone records and the specialized computer programs used in law enforcement data compilation, as well as other information she used to perform her analysis, and the trial court did not abuse its discretion in permitting her to testify as an expert regarding the computer-assisted correlation of cellular telephone data; the weight to be given her testimony was for the jury. Moreover, the correlation and analysis of large numbers of cellular telephone calls, using specialized computer programs and other tools and resources specific to forensic analysis, is a matter "beyond the ken of the average layman." *Smith*, supra, 247 Ga. at 619. The trial court did not abuse its discretion in admitting this testimony.

*Judgments affirmed. Doyle, P. J., and McFadden, J., concur.*