**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2015**

# In the Court of Appeals of Georgia

A15A0141. HOWERTON v. HARBIN CLINIC, LLC, et al.

BRANCH, Judge.

Following the loss of her job as a surgical technician at Floyd Medical Center, Mindy Howerton filed suit in Floyd County Superior Court against Harbin Clinic, LLC and one of its employees, Kenneth C. Sands, M. D. Howerton asserted claims against both defendants for tortious interference with her employment contract, assault and battery, and intentional infliction of emotional distress. She also asserted a claim against Harbin Clinic for the negligent hiring, retention, and supervision of Sands. Howerton now appeals from an order of the trial court granting summary judgment to Harbin Clinic as to all of the claims Howerton asserted against it and granting summary judgment to Sands on all of Howerton's claims against him, other than assault and battery. For reasons explained more fully below, we find that the trial

court erred in granting summary judgment to Sands on Howerton's claims for tortious interference with her employment contract and intentional infliction of emotional distress. We therefore reverse that part of the trial court's order. We affirm the grant of summary judgment to Harbin Clinic on all of the claims Howerton asserted against it.

On an appeal from a grant of summary judgment, we review the record de novo, construing the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the party opposing the summary judgment motion. *Wright v. IC Enterprises*, 330 Ga. App. 303 (765 SE2d 484) (2014). Moreover, the unrefuted testimony or sworn pleadings of the party opposing summary judgment must "be taken as true for purposes of deciding that motion." *Peach Blossom Dev. Co. v. Lowe Elec. Supply Co.*, 300 Ga. App. 268, 271 (684 SE2d 398) (2009) (citation and punctuation omitted). Additionally, where the record shows that one or more witnesses have offered conflicting testimony about a material fact, it is for the jury, and not the court, to resolve that conflict. *Smith v. Tenet HealthSystem Spalding*, 327 Ga. App. 878, 879 ( 1) (761 SE2d 409) (2014) (footnote omitted).

Viewed in the light most favorable to Howerton, as the non-movant, the record shows that Harbin Clinic, LLC, is a multi-specialty medical practice with locations

in north Georgia, including Rome. From July 2006 through June 2011, Harbin Clinic employed Kenneth C. Sands, M. D., as an orthopedic surgeon in its Rome office. Harbin Clinic, in turn, had an agreement with Floyd Medical Center ("FMC") under which physicians employed by Harbin Clinic had surgical privileges at FMC.[1] The operating rooms in which Harbin Clinic doctors performed surgery were staffed by FMC personnel, including nurses and surgical technicians employed by FMC.

From April 2008 until October 2012, Mindy Howerton was employed as a surgical technician at FMC. Howerton was hired to work FMC's first shift, and it was during this shift that Sands regularly performed his surgeries. In late 2008, Howerton was assigned to one of the two FMC surgical teams that worked with Sands and she remained on that team until approximately February 2011.

According to Howerton, the atmosphere in the operating room when Sands was performing surgery was overtly sexual, with Sands engaging in unprofessional conduct of a sexual nature. Sands behaved inappropriately towards Howerton almost immediately after they began working together, with Sands asking Howerton about her sex life and about the appearance of her breasts and her genitals. Sands groped

---

[1] A copy of the agreement between FMC and Harbin Clinic does not appear in the record, so its exact terms are unknown.

Howerton's breasts while reaching for an instrument during surgery on at least one occasion; told Howerton he had gone into the operating room where she was undergoing a gynecological procedure following a miscarriage so he could take "a peek" at her genitals; and asked Howerton to his home to have a glass of wine and relax, explaining that his wife and children were out of town. According to Howerton, these incidents of harassment began to escalate in approximately December 2010. At about that time, following an operating room discussion about hair color, Sands, who has a shaved head, pulled down his scrub pants to expose his pubic hair and the top of his penis to Howerton, ostensibly to demonstrate that he had red hair. On one occasion between December 2010 and January 2011, Sands remarked that Howerton was so pale she would "glow in the dark in the bedroom." Sands then trapped Howerton in a corner of the scrub room and lifted her top so that he could examine her skin. Sands also lifted Howerton's shirt on a second occasion, this time so he could admire her flat stomach. Finally, in late January 2011, Sands started a conversation among the operating room staff as to whether any of them would cheat on their spouse with an ex-lover. After surgery that day, Sands followed Howerton onto the elevator where she was preparing to transport surgical instruments. When they were alone, Sands told Howerton that it was not an ex-lover her husband should

4

be worried about; instead, her husband should be concerned about someone Howerton currently had contact with. Howerton believed that Sands was referring to himself, and she interpreted his comment as meaning that he wanted to have an affair with her.

At some point during her employment at FMC, Howerton began filling in as a surgical technician on the second shift, and in early 2011 she began discussing with her superiors the possibility of transferring to the second shift full time. On January 27, 2011, Howerton had a telephone conversation with Lee Ford, the assistant director of FMC, in which she asked about the possibility of moving to a permanent position on second shift. During that same conversation, Howerton told Ford of several specific instances of Sands's sexually harassing conduct.[2] According to Howerton, Ford responded by telling her not to worry about Sands, because Howerton would be given a position on second shift .

---

[2] Howerton testified that she had not reported Sands's conduct previously because she feared Sands would have her fired. Howerton explained that she saw how much money Sands brought into FMC because of all the surgeries he performed, and she assumed from this fact that Sands would have significant clout at the hospital. Howerton further stated that in March 2009, she left work at the end of her shift, after speaking with the charge nurse who was her supervisor. Sands later called Howerton and chastised her for leaving work without his permission. According to Howerton, Sands told her that he "signed her paychecks," he "decided her hours," and that Howerton did not understand how much influence Sands had, not just at FMC, but throughout the local medical community.

Before Howerton's transfer to the second shift could be completed, a confrontation occurred between Sands and Howerton's husband, Scott. Shortly after midnight on February 17, 2011, Sands began texting Howerton. Sands told Howerton that he needed to speak with her and asked if she could talk or if her husband was home. When Howerton responded that she could communicate by text, Sands replied that he wanted to speak with her and that he would call her the next day. At approximately 1:40 a.m., Scott Howerton texted Sands, identified himself, and told Sands that he had recorded the message Sands left on "the 27th";[3] that he believed Sands had threatened Howerton's job in that message; that because of Sands's "inappropriate actions lately" he had allowed his wife "to keep my digital recorder with her"; and that Howerton had recorded the conversation in which Sands had intimated that he wanted to have an affair with Howerton. Shortly after Scott sent that message, Sands called Howerton's cell phone and Scott answered. The two men had an argument, during which Sands allegedly told Scott that his wife was fired. After Scott told Sands that he was recording their conversation, Sands abruptly ended the call.

---

[3] Presumably this date referred to the 27th of January, which is the same day Howerton testified that she reported Sands's sexual harassment to Lee Ford.

During his deposition, Sands admitted that he may have told Scott he could have Howerton fired. He further testified that during their conversation Scott accused Sands of inappropriate conduct towards Howerton and that throughout his "rantings," Scott "kept coming around to why he sent [his wife] to the hospital with a tape recorder." Sands admitted that he never followed up with Howerton to determine whether she had used the tape recorder Scott referred to while at work and, if so, where she had used it.

As a result of his conversations with Scott, Sands contacted Gia Pyles, the charge nurse at FMC who was responsible for scheduling staff in the operating rooms and who served as Howerton's direct supervisor, at approximately 7:00 a.m. the morning of February 17. Sands told Pyles that he had learned that Howerton was recording conversations that were occurring in the operating room. Although Sands testified that he spoke only to Pyles about Howerton's allegedly making recordings in the operating room, Howerton produced evidence showing that Sands had contacted everyone on both of his operating room teams and told them that Howerton

would no longer be working with them.[4] Sands reportedly told some team members that Howerton had been bringing a tape recorder into the operating room. He told other team members that Howerton had been fired from the team because she had saved some messages Sands had sent her and that she was now accusing Sands of harassment.

Also on the morning of February 17, Howerton received a call from Lee Ford, asking her to come to the hospital to fill out the paperwork necessary for Howerton to begin work on the second shift. When Howerton arrived for that meeting she found

[4] The evidence Howerton presented in opposition to summary judgment included transcripts of telephone conversations Howerton had with several of her team members and with her three supervisors. Both in the court below and in this Court, Sands argues that these transcripts are inadmissible evidence and should be excluded from consideration in deciding Sands's summary judgment motion, as they were not properly authenticated and do not represent the best evidence of the recorded conversations. The transcripts of these phone calls, however, merely served to corroborate Howerton's own testimony. Thus, even in the absence of the transcripts, Sands would not have been entitled to summary judgment and therefore any consideration of the transcripts at the summary judgment stage was harmless error. See *Citrus Tower Boulevard Imaging Ctr. v. Owens*, 325 Ga. App. 1, 11 (4) (752 SE2d 74) (2013); *Brewer v. Williams*, 167 Ga. App. 151, 153 (6) (305 SE2d 891) (1983). Moreover, it appears from the record that Howerton will be able to produce the actual recordings and authenticate the same at any trial of this case. See *Rodriguez-Nova v. State*, 295 Ga. 868, 869-870 (2) (763 SE2d 698) (2014) ("an audio recording can be authenticated by the testimony of one party to the recorded conversation") (citations omitted); *Hernandez-Garcia v. State*, 322 Ga. App. 455, 463 (4) (a) (745 SE2d 706) (2013) (transcripts of audio recordings can be authenticated by evidence showing that they accurately reflect the recorded conversations).

both Ford and Dr. Becky Lowrey, the FMC director of surgical services, waiting for her. Instead of discussing Howerton's transfer, however, both women questioned Howerton about what had happened with Sands. Lowrey also told Howerton that she had been informed that Howerton "was wearing a wire" in the operating room and that such conduct "was a HIPAA violation and grounds for termination." When she realized that Ford and Lowrey wanted to discuss the situation with Sands, Howerton called her husband to come to the meeting because she wanted him to explain his conversation with Sands. While they were waiting for Scott to arrive, Howerton asked if they could discuss her transfer to the second shift. Lowrey responded that she was unsure as to whether they could make the transfer, as FMC did not believe Howerton's skill level was "up to par." This was the first criticism Howerton had ever heard of her job skills. Ford also indicated that an additional reason for delaying the transfer was that FMC didn't know "how all this is going to work out . . . with Dr. Sands." Lowrey then agreed that they did not know how the situation was "going to work."

Shortly after that meeting, Lowrey called Howerton and told her that the second shift position she had been promised was not currently available. To separate Howerton from Sands, however, FMC proposed moving Howerton to work on

9

outpatient surgeries, as opposed to inpatient surgeries.[5] Lowrey told Howerton that in the outpatient position she would work at least three days a week for eight to ten hours a day and that Howerton would probably be asked to work additional days, as well as some overtime. According to Howerton, the hours she was promised in the outpatient position never materialized and her hours were significantly reduced after she transferred to that position. The reduction in income caused severe financial distress, including the loss of Howerton's home and her car. Howerton's employment with FMC ended in October 2012. In June 2011, Sands resigned from Harbin Clinic and took a position with a medical practice in Florida.

In February 2013, Howerton filed the current lawsuit against Harbin Clinic and Sands. She asserted claims against both Sands and Harbin Clinic for tortious interference with her employment contract, assault and battery, and intentional infliction of emotional distress, alleging that Harbin Clinic was liable for Sands's conduct under the doctrine of respondeat superior. Howerton also asserted a claim against Harbin Clinic for its negligent hiring, retention, and supervision of Sands.

---

[5] In the second shift position, Howerton would still have been working in the same operating rooms as Sands, and there was therefore a chance that she and Sands would encounter each other. Outpatient surgeries took place in a different building and so transferring Howerton to the outpatient position greatly reduced the possibility of any interaction between Howerton and Sands.

Both Harbin Clinic and Sands moved for summary judgment on all of Howerton's claims against them. Following a hearing on that motion, the trial court granted summary judgment to both Sands and Harbin Clinic on Howerton's claims for tortious interference and intentional infliction of emotional distress; granted summary judgment to Harbin Clinic on Howerton's claim for assault and battery on the grounds that Harbin Clinic could not be held vicariously liable for the conduct of Sands that served as a basis for that claim; and granted summary judgment to Harbin Clinic on Howerton's claim for negligent hiring, retention, and supervision. Howerton now appeals from that order.[6]

1. In her first enumeration of error, Howerton asserts that the trial court erred in granting summary judgment against her and in favor of Sands on her claim for tortious interference with her employment contract.[7] We agree.

---

[6] Howerton has not appealed the grant of summary judgment to Harbin Clinic on her claim that Harbin Clinic is vicariously liable for Sands's alleged assault and battery. Nor has Sands cross-appealed the trial court's denial of his motion for summary judgment as to that claim. Accordingly, the assault and battery claim is not at issue in this appeal.

[7] In her appellate brief, Howerton concedes that Harbin Clinic cannot be held vicariously liable for Sands's alleged tortious interference with Howerton's employment contract. We therefore affirm the trial court's grant of summary judgment to Harbin Clinic on this claim.

11

To prevail on her tortious interference claim against Sands, Howerton must prove that she had a valid employment contract with FMC; that Sands acted wrongfully and without privilege when he reported to Howerton's superiors that she was recording conversations in the operating room; that Sands acted deliberately and maliciously; that as a result of Sands's conduct, Howerton's employment with FMC was adversely affected; and that consequently, Howerton suffered damages. See *Atlanta Market Ctr. Mgmt. v. McLane*, 269 Ga. 604, 608 (2) (503 SE2d 278) (1998).

(a) "To establish that a defendant acted without privilege, the plaintiff must show that the defendant was a stranger to the contract" with which he allegedly interfered; one who is not a stranger to a contract cannot be held liable for tortiously interfering with that agreement. *Brathwaite v. Fulton-DeKalb Hosp. Auth.*, 317 Ga. App. 111, 113 (1) (729 SE2d 625) (2012) (citation omitted). In this case, the trial court found that Sands was not a stranger to Howerton's employment contract because he was an unintended third-party beneficiary of that contract. This holding was in error.

The rule that a third-party beneficiary of a contract is not a stranger thereto evolved from the law providing that an intended third-party beneficiary may sue to enforce a contract even though he is not a party to the agreement. "In order for a third

12

party to have standing to enforce a contract, it must clearly appear from the contract that it was *intended* for his or her benefit."*Boller v. Robert W. Woodruff Arts Ctr.*, 311 Ga. App. 693, 698 (3) (716 SE2d 713) (2011) (punctuation and footnote omitted; emphasis in original). See also OCGA § 9-2-20 (b) ("[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract"). To have standing to sue on a contract, "[t]he third-party beneficiary need not be specifically named [therein]; the dispositive issue is whether the [contracting] parties' intention to benefit the third party is shown on the face of the contract." *Dillon v. Reid*, 312 Ga. App. 34, 40 (4) (717 SE2d 542) (2011) (citations and punctuation omitted). Thus, the mere fact that an individual would receive some incidental benefit from performance of a contract is insufficient to make them an intended third-party beneficiary of the agreement. *Boller*, 311 Ga. App. at 698 (3).

In the context of a tortious interference claim, the category of third-party beneficiaries excluded from the so-called "'stranger doctrine' has been expanded to cover those who benefit from the contract of others, without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary." *Atlanta Market Ctr. Mgmt.*, 269 Ga. at 609 (2) (citation omitted). To be an unintended

13

third-party beneficiary, an individual or entity must have a legitimate and direct economic interest in the contract at issue. See *Mabra v. SF, Inc.*, 316 Ga. App. 62, 65 (728 SE2d 737) (2012) ("[t]hose who have a direct economic interest in or would benefit from a contract with which they are alleged to have interfered (even though not intended third-party beneficiaries of the contract) are not strangers to the contract and cannot have tortiously interfered") (citation omitted); *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741 (492 SE2d 526) (1997) (to qualify as an unintended third-party beneficiary, "[t]he defendant must have a bona fide economic interest in the contract") (citations omitted); *Lake Tightsqueeze v. Chrysler First Financial Svcs. Corp.*, 210 Ga. App. 178, 181 (5) (435 SE2d 486) (1993) (same). Thus, where a particular project or transaction involves "'a comprehensive set of interwoven contracts,'" each of the parties to any individual contract involved in the transaction is a third party-beneficiary of the other contracts necessary to complete the project. *Atlanta Market Ctr. Mgmt.*, 269 Ga. at 609 (2), quoting *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting of Atlanta*, 205 Ga. App. 57, 60 (1) (421 SE2d 295) (1992). Notably, however, one does not become an unintended third-party beneficiary of a contract simply because he might receive some incidental benefit from performance of that agreement.

14

In this case, Sands argued, and the trial court found, that Harbin Clinic has an agreement with FMC for the use of its operating rooms; that this agreement requires FMC to employ qualified personnel to work in the operating room during surgeries performed by Harbin Clinic physicians; and that because Sands could not perform surgery without FMC employees, he had a direct economic interest in FMC's contracts with its individual employees, including Howerton. This reasoning is inconsistent with the applicable law.

Our cases make clear that to qualify as an unintended third-party beneficiary of a contract, a party must have a *direct* economic interest in the subject of the specific contract at issue. For example, in *Disaster Services*, 228 Ga. App. 739, a corporate entity known as ERC had contracted to buy a building in which Eastern Airlines ("EAL") had a leasehold interest. Id. Thus, the sale of the building also involved a separate contract for the buyout of EAL's leasehold interest. Before the sale could be completed, however, and while EAL was still in possession of the building pursuant to its lease, the building suffered significant fire damage. Id. EAL, who bore responsibility for repairing the damage, contracted with Disaster Services, Inc. ("DRI") to repair the building in three phases. Id. After the first phase of repairs was completed, ERC asked that EAL delay any further repairs "so that ERC could

15

negotiate a purchase of the fee simple interest in the building . . . and have total ownership and control of the building." Id. ERC thereafter negotiated for the purchase of the building "as-is." Id. at 740. EAL then assigned its rights under the lease to ERC and this "final agreement relieved EAL of any duty to have the building repaired and assigned to ERC any rights to the [fire] insurance proceeds." Id. Following this transaction, EAL exercised its right to cancel the repair contract with DRI. DRI then sued ERC for tortious interference with its contractual and business relationship with EAL. The trial court granted summary judgment to ERC and this Court affirmed, finding that ERC was not a stranger to the repair contract because it was an unintended third-party beneficiary of that agreement. Specifically, we held that ERC had a direct financial interest in the repair contract, because the subject of that contract was a building which ERC had agreed to purchase. Id. at 740-741.

Similarly, in *Jefferson-Pilot Communications Co.*, Jefferson-Pilot contracted with Phoenix City to purchase a radio station that was being built by Phoenix City. After a dispute arose between the parties as to who would bear certain construction costs, Jefferson Pilot wrote a letter to Phoenix City's construction lender, informing it of the parties' disagreement. Id. at 58. In a subsequent breach of contract action brought by Jefferson-Pilot, Phoenix City asserted a counterclaim for tortious

16

interference with its construction loan contract. Phoenix City prevailed on this claim at trial but on appeal, this Court reversed. In so doing, we found that because the subject of the loan contract was a structure which Jefferson-Pilot had agreed to purchase, Jefferson-Pilot had a direct financial interest in that contract. Id. at 60-61 (1). Accordingly, Jefferson-Pilot was not a stranger to the loan contract, as it was an unintended third-party beneficiary of that agreement. Id. at 61 (1).

Unlike the defendants in *Jefferson-Pilot* and *Disaster Services*, Sands has not demonstrated that he has a direct economic interest in Howerton's personal employment contract with FMC. The record shows that three separate contracts resulted in Howerton and Sands working together: Harbin Clinic's contract with FMC; Harbin Clinic's contract with Sands; and FMC's contract with Howerton. Unlike the contracts at issue in *Disaster Svcs.* and *Jefferson-Pilot*, however, these three agreements do not constitute "a comprehensive interwoven set of contracts." *Jefferson-Pilot*, 205 Ga. App. at 60 (1). Specifically, the contracts at issue in *Disaster Svcs.* and *Jefferson-Pilot*, although separate, each involved the same subject matter, namely a specific building. Each of the three contracts at issue in this case, however, addresses a specific subject that is separate from and independent of the subject addressed by the other two contracts. Specifically, one contract sets forth the terms

17

for the use of FMC's operating rooms by Harbin Clinic physicians; one sets forth the terms of Harbin Clinic's employment of Sands; and one sets forth the terms of Howerton's employment with FMC.

The fact that there was no direct relationship between Harbin Clinic's contract with FMC and Howerton's individual employment contract is further demonstrated by the fact that the agreement with Harbin Clinic merely required FMC to staff its operating rooms with qualified personnel; it did not require FMC either to employ particular individuals or to assign specific employees to particular operating rooms. Rather, the contract between FMC and Harbin Clinic gave FMC control over which of its employees were assigned to a specific operating room. Thus, Howerton's assignment to Sands's operating room was a coincidental, rather than a direct, result of Harbin Clinic's contract with FMC. It was also a coincidental result of Howerton's employment contract with FMC, as FMC could and did assign Howerton to operating rooms other than Sands's. Given these facts, nothing in the record supports the conclusion that Sands, as an employee of Harbin Clinic, had a direct economic

18

interest in the contracts FMC had with its individual employees, including Howerton.[8] Accordingly, the trial court erred in holding that Sands was a third-party beneficiary of Howerton's employment contract.

Additionally, in analyzing Sands's claim that he was not a stranger to the contract at issue, the trial court neither acknowledged nor applied those cases that have addressed claims of tortious interference with an employment contract. Those cases show that Georgia has long recognized that even an at-will employment contract "is a valuable contract right, which may not be unlawfully interfered with by a third person without such authority." *Moore v. Barge*, 210 Ga. App. 552, 553 (1) (436 SE2d 746) (1993), citing *Ga. Power Co. v. Busbin*, 242 Ga. 612, 613 (2) (250 SE2d 442) (1978). Under Georgia law, therefore, an employee has a cause of action for tortious interference where "a party with no authority to discharge [the employee], being activated by an unlawful scheme or purpose to injure and damage the employee, maliciously and unlawfully persuades the employer to breach the contract

---

[8] It may be that Sands, like all other surgeons operating at FMC, received some incidental benefit from FMC's contracts with its individual employees, in that the presence of such personnel helped to facilitate surgery. We decline to hold, however, that this kind of incidental benefit is sufficient to transform Sands, as an employee of an entity that contracted with FMC, into an unintended third-party beneficiary of FMC's contracts with its employees.

19

with the employee." *Moore*, 210 Ga. App. at 553 (1) (citation and punctuation omitted). See also *Brathwaite*, 317 Ga. App. at 113 (1). Accordingly, with respect to employment contracts, the category of "non-strangers" who are privileged and therefore immune from a tortious interference claim is quite limited. It includes only corporate principals or officers or co-employees who have the authority to terminate or recommend the termination of the employment of the person asserting the tortious interference claim. See *Dong v. Shepeard Community Blood Center*, 240 Ga. App. 137, 138 (2) (522 SE2d 720) (1999) (where defendant was employee's supervisor and had the authority to evaluate employee and recommend his discharge, she was not a stranger to the employment relationship and could not be held liable for tortious interference); *Hylton v. American Assn. For Vocational Instructional Materials*, 214 Ga. App. 635, 638 (2) (448 SE2d 741) (1994) (those with authority to supervise and evaluate plaintiff in his job and to terminate plaintiff's employment "were not strangers to the [employment] contract [and] could not be liable for tortious interference" with that contract) (citations omitted); *Johnson v. Rogers*, 214 Ga. App. 557, 559 (3) (448 SE2d 710) (1994) (supervisor with authority to recommend termination and superior authorized to terminate plaintiff's employment were not strangers to the plaintiff's employment contract). Additionally, the allegedly tortious

20

conduct must fall within the scope of the job duties of the co-employee who engaged in that conduct. Thus, a co-employee who has no authority to discharge or recommend the discharge of the employee in question may be held liable for tortiously interfering with that employee's contract. See *Nicholson v. Windham*, 257 Ga. App. 429, 432 (2) (571 SE2d 466) (2002) (not "all co-workers are immune from suit for tortious interference" with an employment contract; such immunity is available only to those "co-employees engaged in conduct 'within the scope of their authority'"); *Brathwaite*, 317 Ga. App. at 113-114 (1).

*Braithwaite* serves as an example of just how broadly Georgia's courts have defined "strangers" to an employment contract. The defendant in that case, Quinn, had supervised Braithwaite in her job as a coding specialist at Grady Hospital. 317 Ga. App. at 112. After learning of allegations that Quinn had engaged in misconduct in her prior job, Braithwaite reported this information to Quinn's supervisor and following an investigation, Quinn was forced to resign. Id. After her resignation, however, Quinn maintained contact with the hospital's CFO, who eventually re-hired Quinn. Id. After being reinstated, Quinn fired Braithwaite and Braithwaite sued, asserting a claim against Quinn for tortious interference with her employment contract. The trial court dismissed this count of the complaint, concluding that

21

because Quinn was Braithwaite's supervisor and had the authority to fire Braithwaite, she was not a stranger to the employment contract. This Court reversed, noting that the complaint "alleged that, while not employed by Grady, Quinn took actions to tortiously interfere with Brathwaite's employment contract with Grady by soliciting and obtaining an agreement with [the hospital's CFO] to terminate Brathwaite after Quinn was re-hired." Id. at 114 (1). Thus, because "[t]hese allegations concerned actions taken by Quinn when she was a stranger to the employment contract" (i.e., when Quinn was without the authority to supervise and terminate Braithwaite's employment), Quinn could be held liable for that conduct. Id.

In this case, Sands was not even a co-employee of Howerton, as they worked for two separate entities. Although a contractual relationship of some kind existed between these two entities, there is no evidence showing that any such agreement authorized Sands, as an employee of Harbin Clinic, to fire FMC's employees or recommend their termination. Indeed, Sands testified that he was without authority even to remove Howerton from the team that staffed his operating room; rather, he had to ask FMC to remove her.

As the foregoing discussion demonstrates, Sands was neither a party to Howerton's employment contract nor an intended third-party beneficiary thereof.

22

Additionally, Sands had no direct economic interest in Howerton's employment contract. Given these facts, and in the absence of any evidence showing that he had the authority to terminate Howerton or recommend her termination from FMC, we find that Sands was a stranger to Howerton's employment contract and therefore is not immune from Howerton's claim for tortious interference.

(b) Sands argues that even if he was not a stranger to Howerton's employment contract, he is nevertheless entitled to summary judgment on the tortious interference claim because it is "undisputed" that he did not act with malicious intent. With respect to tortious interference claims, the term "malice" is "to be given a liberal meaning; malicious or maliciously means any unauthorized interference, or any interference without legal justification or excuse." *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III*, 213 Ga. App. 333, 334 (2) (444 SE2d 814) (1994) (citations omitted). Here, Sands contends that Howerton cannot prove malice because he was required by law to report her HIPAA violation. At the hearing on Sands's summary judgment motion, the trial court rejected this argument, finding that Sands had failed to show any knowledge on his part that Howerton's recordings violated HIPAA. Specifically, the trial court noted that the evidence failed to demonstrate that Sands knew that Howerton had recorded confidential patient information; rather, it showed

23

only that Sands was aware that Howerton had recorded his allegedly inappropriate comments. Accordingly, the trial court found that there was at least a factual question as to whether Sands had actual knowledge of a HIPAA violation. We agree.

Sands testified at his deposition that Scott informed him via text message that Howerton had been taping conversations that occurred in the operating room to obtain evidence of Sands's sexual harassment; that he was so stunned by this revelation that he "wrote down the texts 'verbatim'"; and that he had maintained his handwritten copy of Scott's texts. In his supplemental interrogatory responses,[9] Sands supplied the content of the text messages that were exchanged between his cell phone and Howerton's phone; none of those messages contain a statement to the effect that

_____

[9] After revealing during his deposition that he had transcribed the text messages that were exchanged during the early morning hours of February 17, Sands supplemented his interrogatory responses to provide what he said were the "verbatim" texts. In her response to Sands's summary judgment motion, Howerton quoted from these discovery responses. She also filed a request, together with her notice of filing of original discovery, asking Sands to file the originals of both her deposition and his verified interrogatory responses. Sands filed the original of Howerton's deposition as well as his initial verified discovery responses, but not his supplemental responses. Sands did not file a reply brief in which he disputed the quotes set forth in Howerton's pleadings, and although his supplemental responses (as quoted in Howerton's brief) were presented to and considered by the trial court at the hearing below, Sands did not object to their presentation or claim that Howerton had misrepresented his responses. Additionally, Sands has not challenged the accuracy of these quotes on appeal. Given these circumstances, we have treated the quotations set forth in the pleadings as accurate.

24

Howerton was recording conversations in the operating room. Rather, Scott informed Sands that he had recorded the message Sands left on "the 27th"; that because of Sands's "inappropriate actions lately" he had allowed his wife "to keep my digital recorder with her"; and that Howerton had recorded the conversation in which Sands intimated that he wanted to have an affair with Howerton. Howerton testified that the recorded conversation to which Scott was referring took place in an elevator and not in the operating room.

With respect to information he obtained during his telephone conversation with Scott, Sands testified that Scott accused him of acting inappropriately towards Howerton and that Scott "kept coming around to why he sent [his wife] to the hospital with a tape recorder." Sands did not testify, however, that Scott told him specifically that Howerton was recording conversations in the operating room. Finally, Sands also acknowledged that he never discussed with Howerton what she had recorded or where she had recorded it.

We agree with the trial court that this evidence shows that a jury question exists not only as to Sands's knowledge of a HIPAA violation, but also as to Sands's motive and intent in reporting any such violation. In other words, as the trial court noted, a factual question exists as to whether Sands reported the alleged HIPAA violation

25

because he felt legally obligated to do so, or because he was seeking to undermine Howerton at her job in hopes of undermining her sexual harassment allegations.

(c) Sands further argues that Howerton's tortious interference claim must fail because there is no evidence that his report regarding Howerton's alleged HIPAA violation induced FMC to take action with respect to Howerton's employment contract. Construed in favor of Howerton, however, the record shows that prior to Sands's report, Howerton had received an offer of employment on the second shift;[10] that after Sands's report, the second shift position was no longer available to Howerton; that in her meeting with her superiors on the morning Sands made his report, Howerton's job skills were criticized for the first time; that Howerton was

---

[10] Both in the trial court and on appeal, Sands argued that Howerton's claim that she received the job offer at issue constitutes inadmissible hearsay. This contention is without merit. "Testimony is considered hearsay if the witness is testifying to another party's statement in order to prove or demonstrate the truth of the matter asserted in that statement." *In re Burton*, 271 Ga. 491, 494 (3) (521 SE2d 568) (1999) (citation and punctuation omitted). Thus, Howerton's testimony as to specific statements made by her supervisors in offering Howerton the position on second shift would constitute inadmissible hearsay. Howerton could testify, however, that she requested a transfer to second shift; that she reported Sands's sexually-harassing conduct to her superiors; and that at some time after making that request and providing that report, she was offered a position on the second shift. Such facts would be within Howerton's personal knowledge and therefore would not be considered hearsay. See *Palencia-Barron v. State*, 318 Ga. App. 301, 305-306 (2) (b) (733 SE2d 824) (2012); *Newsome v. State*, 288 Ga. 647, 649-650 (2) (706 SE2d 436) (2011).

transferred to outpatient surgery so as to remove her from the building where Sands worked; and that from that point forward Howerton's hours at FMC were steadily reduced until they became nonexistent. This evidence is sufficient to create a jury issue on the question of whether Sands's conduct interfered with Howerton's employment contract.

In light of the foregoing, we find that Sands was not entitled to summary judgment on Howerton's tortious interference claim. Specifically, the evidence shows that Howerton had a valid employment contract with FMC and that Sands was a stranger to that contract. The evidence further shows that questions of fact exist as to whether Sands acted deliberately and maliciously in reporting Howerton's alleged HIPAA violation; whether Sands's conduct adversely affected Howerton's employment with FMC; and whether and to what extent Howerton suffered damages as a result of Sands's alleged conduct.

2. Howerton further contends that the trial court erred in granting summary judgment to Sands on her claim for intentional infliction of emotional distress.[11] In

---

[11] In her appellate brief, Howerton concedes that Harbin Clinic cannot be held vicariously liable for Sands's conduct which serves as the basis for her claim of intentional infliction of emotional distress. We therefore affirm the trial court's grant of summary judgment to Harbin Clinic on this claim.

analyzing this claim of error, we are cognizant of the fact that, under Georgia law, "[t]he burden which the plaintiff must meet in order to prevail in this cause of action is a stringent one." *Metropolitan Atlanta Rapid Transit Auth. v. Mosley*, 280 Ga. App. 486, 490-491 (3) (634 SE2d 466) (2006) (citation and punctuation omitted). The plaintiff is required to prove that the defendant engaged in "outrageous conduct," and Georgia's definition of that term provides a high degree of tolerance for a wide variety of questionable conduct. "Significantly, the defendant's conduct 'must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kirkland v. Tamplin*, 285 Ga. App. 241, 245 (2) (645 SE2d 653) (2007), quoting *Martin v. North American Van Lines*, 226 Ga. App. 187, 190 (2) (c) (1997). As explained more fully below, however, we find this to be one of those relatively rare cases where the conduct complained of meets Georgia's narrow definition of outrageous.

To recover for intentional infliction of emotional distress, a plaintiff must show that the defendant acted intentionally or recklessly; that his conduct was extreme and outrageous; that the plaintiff suffered emotional distress as a result of the defendant's conduct; and that the emotional distress she experienced was severe. *Ghodrati v. Stearnes*, 314 Ga. App. 321, 323 (723 SE2d 721) (2012). At the summary judgment

stage, a court must determine, as a matter of law, whether the available evidence would permit a jury to find both that the defendant's conduct rose to the level of outrageousness required to support an intentional infliction of emotional distress claim and whether the distress suffered by the plaintiff rose to the level of severity required to recover for such a claim. *Blockum v. Fieldale Farms Corp.*, 275 Ga. 798, 801 (3) (573 SE2d 36) (2002). As noted above, plaintiffs bear a heavy burden with respect to both of these elements, but most especially "in establishing the type of extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress." *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 640 (2) (a) (484 SE2d 659) (1997). A plaintiff meets this burden by coming forward with evidence which would allow "reasonable persons [to] find the presence of extreme and outrageous conduct," as defined under Georgia law, as well as severe emotional distress resulting from that conduct. *Yarbray v. Southern Bell Tel. & Telegraph Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991). Where this burden is met, the questions of whether the defendant's conduct and the resulting distress suffered by the plaintiff warrant recovery under the law become ones for the jury, which "must find the facts and make its own determination." Id. In this case, construing the evidence in Howerton's favor and giving her the benefit of all reasonable doubts and inferences,

29

we find that she has produced sufficient evidence to create jury questions as to whether Sands engaged in extreme and outrageous conduct and, if so, whether that conduct caused Howerton severe emotional distress.

(a) Conduct that can be characterized as merely vulgar, tasteless, rude, or insulting will not support a claim for intentional infliction of emotional distress. *Troncalli v. Jones*, 237 Ga. App. 10, 15 (3) (514 SE2d 478) (1999). See also *Ashman v. Marshall's of MA*, 244 Ga. App. 228, 229 (1) (535 SE2d 265) (2000) ("[a]ctionable conduct does not include insults, threats, indignities, annoyances, petty oppressions, or other vicissitudes of daily living but must go beyond all reasonable bounds of decency"). Rather, the conduct on which an intentional infliction of emotional distress claim is based must be so abusive or obscene that reasonable people would naturally assume that the target of such conduct would experience "intense feelings of humiliation, embarrassment, fright or extreme outrage." *Jones v. Fayette Family Dental Care*, 312 Ga. App. 230, 232 (718 SE2d 88) (2011) (physical precedent only). See also *Mears*, 225 Ga. App. at 641 (2) (b). As we have explained previously, "[t]he rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member

of the community would arouse her resentment against the defendant so that she would exclaim 'Outrageous!'" *Ashman*, 244 Ga. App. at 229 (1) (footnote omitted).

In assessing whether conduct is sufficiently outrageous to support an intentional infliction of emotional distress claim, we have found that conduct which occurs in the context of the victim's employment "'may produce a character of outrageousness that might otherwise not exist.'" *Fayette Family Dental Care*, 312 Ga. App. at 232, quoting *Bridges v. Winn-Dixie Atlanta*, 176 Ga. App. 227, 230 (1) (335 SE2d 445) (1985). This rule results from the fact that the workplace "presents a hierarchy of structured relationships which cannot easily be avoided" and thereby "provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition." *Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166, 169 (1) (381 SE2d 303) (1989) And where a defendant has engaged in a series of acts or a pervasive pattern of conduct allegedly causing emotional distress, we must view the defendant's acts cumulatively, rather than individually, when assessing their extreme and outrageous nature. See *Ferman v. Bailey*, 292 Ga. App. 288, 291 (2) (a) (664 SE2d 285) (2008) ("evidence of [defendant's] pervasive pattern of harassing behavior demonstrated the extreme and outrageous nature of his conduct, especially given the control that he exercised over" the plaintiff as her employer);

31

*Mears*, 225 Ga. App. at 640 (2) (a); *Trimble v. Circuit City Stores,* 220 Ga. App. 498, 499 (469 SE2d 776) (1996).

Here, the record shows that Sands engaged in at least two specific instances of conduct that would support an intentional infliction of emotional distress claim. These include Sands's allegedly telling Howerton that he had gone into the operating room while she was undergoing a gynecological procedure following her miscarriage in order to view her genitals. Howerton testified that not long after the procedure, Sands told her he had gone into the operating room "while my legs were up in the stirrups . . . and got a peek." He made this comment in front of other staff members, while Howerton was assisting in Sands's operating room. Sands then proceeded to question one of those other staff members, who had also assisted in Howerton's procedure. According to Howerton, Sands asked this staff member "what [Howerton] looked like down there. If I shaved, what color my carpet was. Did I have a landing strip . . . . If I had big lips . . . ." We think that an average member of the community, upon hearing of this conduct, would respond with outrage.[12] Additionally, a

---

[12] Sands's telling Howerton that he engaged in this conduct is, without more, sufficient to support a claim for intentional infliction of emotional distress. Howerton would not need to prove that Sands actually entered the operating room, only that he told her he did so.

32

reasonable jury could view this conduct as exceeding "all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community." *Ashman*, 244 Ga. App. at 229 (1) (footnote omitted).

Similarly, a jury could also conclude that Sands's alleged conduct in exposing his pubic hair and the top of his penis to Howerton to demonstrate that he did, in fact, have red hair was so "abusive or obscene as naturally to humiliate, embarrass, frighten, or extremely outrage" Howerton. *Troncalli*, 237 Ga. App. at 15 (3) (citation and punctuation omitted). See *Fayette Family Dental Care*, 312 Ga. App. at 233 (conduct of plaintiff's employer in exposing himself and masturbating in the workplace could be considered extreme and outrageous); *Mangrum v. Republic Indus.,* 260 FSupp2d 1229, 1256 (III) (D) (N. D. Ga. 2003) (supervisor's alleged exposure of his penis to an employee could constitute sufficiently extreme and outrageous conduct to support an intentional infliction of emotional distress claim under Georgia law). Finally, the jury could also view the fact that Sands's engaged in a pervasive pattern of harassing behavior and that he did so in Howerton's workplace as evidence of the extreme and outrageous nature of his conduct. *Ferman*, 292 Ga. App. at 291 (2) (a).

33

(b) "Emotional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Jones v. Warner*, 301 Ga. App. 39, 42-43 (3) (686 SE2d 835) (2009) (citation and punctuation omitted). To recover for such distress, however, it must be extreme. Id. To demonstrate that the emotional distress she suffered was severe, a plaintiff must show, at the very least, that physical and/or mental manifestations of that distress required her to seek medical or psychological treatment. See *Troncalli*, 237 Ga. App. at 11-12 (affirming jury verdict in favor of plaintiff on an intentional infliction of emotional distress claim where the evidence showed that as a result of the defendant's behavior, she "developed shingles, experienced nausea and vomiting, became frightened and depressed, and sought psychological counseling"); *Coleman*, 191 Ga. App. at 168-169 (1) (emotional distress suffered by plaintiff as a result of sexually harassing conduct was sufficiently severe to support a claim for intentional infliction of emotional distress; evidence showed that she suffered "physical manifestations (headaches, crying, chest pains) as well as mental and emotional symptoms (upset, despondency, depression)" and that she sought medical treatment for these conditions); *Anderson v. Chatham*, 190 Ga. App. 559, 567 (8) (379 SE2d 793) (1989) (upholding jury verdict in favor of

34

plaintiff on an intentional infliction of emotional distress claim where the evidence showed that she suffered "significant physical manifestations directly resulting from" the defendant's conduct). Compare *Fayette Family Dental Care*, 312 Ga. App. at 233-234 (evidence showing that plaintiff was "shocked" and "upset" and that she suffered a depressed sex drive was insufficient as a matter of law to prove severe emotional distress, given that plaintiff "sought no treatment from any type of doctor, psychiatrist, psychologist, or counselor"); *Warner*, 301 Ga. App. at 42-43 (3) (plaintiff's evidence failed to prove severe emotional distress where it showed only that plaintiff suffered anxiety, nervousness, sleeplessness, and irritability and that she failed to seek medical or psychiatric treatment for these symptoms); *Abdul-Malik v. AirTran Airways*, 297 Ga. App. 852, 858 (1) (678 SE2d 555) (2009) (affirming grant of summary judgment to defendant on plaintiff's intentional infliction of emotional distress claim; evidence showing only that plaintiff suffered sleeplessness and weight gain and that plaintiff sought no professional help for these symptoms was insufficient to establish severe emotional distress).

According to Howerton, Sands's conduct made her feel "angry," "distressed," "humiliated," "upset," and "disturbed." She further testified that the stress she felt as a result of working with Sands prompted her to seek treatment from her family

35

physician for these symptoms. Howerton's medical records show that she visited her family physician at least three times during the last six months she worked with Sands. On June 10, 2010, Howerton made a "new patient" visit to her family physician. On this visit, Howerton reported experiencing alopecia (hair loss), stress, anxiety, migraines, sleep difficulties, and fatigue. Her physician put her on a "trial" prescription of an antidepressant (Lexapro), and Howerton testified that she took this medication for approximately two months. At her follow-up visit two weeks later, Howerton's physician prescribed an anti-anxiety medication and a sleep aid , and it appears he renewed those prescriptions in December 2010. At that December visit, Howerton again reported suffering from alopecia and anxiety. This evidence, which shows that Howerton suffered physical and mental manifestations of her alleged emotional distress severe enough to require medical treatment, suffices to allow her intentional infliction of emotional distress claim to survive summary judgment.

As the foregoing demonstrates, Howerton presented sufficient evidence to allow reasonable jurors to conclude that Sands's alleged conduct was extreme and outrageous and that she suffered severe emotional distress as a result of that

conduct.[13] Accordingly, the trial court erred in granting summary judgment to Sands on Howerton's claim for intentional infliction of emotional distress.

3. Finally, Howerton contends that the trial court erred in granting summary judgment to Harbin Clinic on her claim for negligent supervision.[14] We disagree.

"For an employer to be held liable for negligent supervision, there must be 'sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff.'" *Novare Group v. Sarif*, 290 Ga. 186, 190-191 (4) (718 SE2d 304) (2011) (punctuation omitted), quoting *Leo v. Waffle House*, 298 Ga. App. 838, 841 (2) (681 SE2d 258) (2009). Here, the record is devoid

---

[13] In his brief, Sands argues that we should affirm the trial court's grant of summary judgment to him on Howerton's intentional infliction of emotional distress claim because Howerton has failed to show that her emotional distress resulted from Sands's conduct, rather than other circumstances in Howerton's life. The question of causation, however, is "peculiarly . . . for the jury, and a court should not take the place of the jury in" resolving that question. *Williams v. Kennedy,* 240 Ga. 163 (1) (240 SE2d 51) (1977). See also *Allen v. Zion Baptist Church of Braselton*, 328 Ga. App. 208, 216 (1) (c) (761 SE2d 605) (2014) ("[c]ausation is usually a jury question, except in plain, palpable and undisputable cases") (citation and punctuation omitted).

[14] Howerton's complaint asserted claims against Harbin Clinic for negligent hiring, retention, and supervision of Sands. On appeal, however, Howerton concedes that Harbin Clinic cannot be found liable for the negligent hiring and retention of Sands and she does not challenge the trial court's grant of summary judgment to Harbin Clinic on these claims.

37

of any evidence showing that Harbin Clinic knew or should have known of Sands's propensity to engage in unprofessional and sexually harassing conduct. By Howerton's own admission, she did not report Sands's conduct to anyone until January 2011, approximately three weeks before she left Sands's surgical team. And Howerton made that report only to her supervisors at FMC. There is no evidence showing if or when this information regarding Sands's alleged conduct was communicated to Harbin Clinic prior to its being served with the complaint. Nor is there any evidence showing that Harbin Clinic had previously received complaints regarding allegedly inappropriate conduct by Sands.

Furthermore, Harbin Clinic produced evidence showing that it did a thorough background check on Sands before hiring him, and that check revealed no indication that Sands had ever engaged in any kind of improper conduct, sexually harassing or otherwise, prior to his employment with Harbin Clinic. Given the evidence of record, the trial court did not err in granting summary judgment to Harbin Clinic on Howerton's negligent supervision claim. See *Doe I v. Young Women's Christian Assn. of Greater Atlanta*, 321 Ga. App. 403, 408 (2) (740 SE2d 453) (2013) (affirming grant of summary judgment to employer on claim for negligent supervision

where the record was "devoid of evidence" that the employee in question had ever engaged in similar behavior); *Leo*, 298 Ga. App. at 842 (2) (same).

For the reasons set forth above, we reverse the grant of summary judgment in favor of Sands on Howerton's claim for tortious interference with her employment contract and her claim for intentional infliction of emotional distress. We affirm the grant of summary judgment in favor of Harbin Clinic as to all of Howerton's claims against it.

*Judgment affirmed in part and reversed in part. Miller, J., concurs. Andrews, P. J., concurs in Divisions 1 and 3 and in the judgment.*